# EXHIBIT A

LEASE AGREEMENT

EASTERN SHORE CENTRE
BALDWIN COUNTY, ALABAMA

TENANT'S TRADE NAME: FOREVER 21

TABLE OF CONTENTS

EASTERN SHORE CENTRE ..................................................................................................... 1

1.   Basic Lease Provisions/Definitions .......................................................................... 4
     (a)   "Demised Premises" .................................................................................. 4
     (b)   "Shopping Center" ..................................................................................... 4
     (c)   "Common Areas" ........................................................................................ 4
     (d)   "Lease Term" .............................................................................................. 4
     (e)   "Lease Year" ............................................................................................... 4
     (f)   "Guaranteed Minimum Rent" ................................................................... 4
     (g)   "Percentage Rent" ...................................................................................... 4
     (h)   "Permitted Use" .......................................................................................... 5
     (i)   "Trade Name" .............................................................................................. 5
     (j)   "Promotion/Marketing Fund and Media/Marketing Fund Fees" ........... 5
     (k)   "Common Area Costs" ............................................................................... 5
     (l)   "Landlord's Mailing Address" ................................................................... 5
     (m)   "Tenant's Mailing Address" ..................................................................... 6
     (n)   "Place to Pay Rent" .................................................................................... 6
     (o)   "Major Occupants" ..................................................................................... 6
     (p)   "Floor Area" ................................................................................................ 6
     (q)   "Gross Leased Area" ................................................................................... 6
     (r)   "Exhibits" .................................................................................................... 6
     (s)   "Term Commencement Date" .................................................................... 6
     (t)   "Term Expiration Date" .............................................................................. 6
     (u)   "Rent Commencement Date" ..................................................................... 6
     (v)   "Gross Sales" ............................................................................................... 6
     (w)   "Guarantor" ................................................................................................ 7

2.   Demised Premises ...................................................................................................... 7

3.   Term ............................................................................................................................ 7

4.   Rent ............................................................................................................................. 7
     (a)   Guaranteed Minimum Rent ....................................................................... 7
     (b)   Taxes and Insurance Expense ................................................................... 7
     (c)   Percentage Rent .......................................................................................... 8
     (d)   Additional Rent ........................................................................................... 9
     (e)   Interest and Late Charges .......................................................................... 9
     (f)   Payment of Rent .......................................................................................... 9
     (g)   Survival ........................................................................................................ 9

5.   Improvements and Delivery of Demised Premises .................................................. 9

6.   Use of the Demised Premises .................................................................................. 10
     (a)   Continuous Occupancy ............................................................................. 10
     (b)   Failure to Comply ..................................................................................... 11
     (c)   Violation of Laws ...................................................................................... 11
     (d)   Rules and Regulations .............................................................................. 11
     (e)   Installation of Signs, Awnings, Canopies, Fixtures and Alterations by Tenant .............. 13
     (f)   Hazardous Materials ................................................................................. 13

7.   Landlord's Covenant to Maintain ............................................................................ 13

8.   Tenant's Covenant to Maintain ............................................................................... 14

9.   Common Areas ......................................................................................................... 14

10.  Utilities ..................................................................................................................... 15

FOREVER 21, INC.

| | | |
|---|---|---|
| 11. | Laws and Insurance Standards | 15 |
| 12. | Indemnification | 16 |
| 13. | Insurance | 16 |
| | (a) Tenant's Insurance | 16 |
| | (b) Landlord's Insurance | 17 |
| | (c) Waiver of Claims; Waiver of Subrogation | 17 |
| | (d) Blanket Policies | 17 |
| 14. | Ownership of Certain Property and Surrender of Premises | 18 |
| 15. | Landlord's Entry and Easement for Pipes | 18 |
| | (a) Landlord's Entry | 18 |
| | (b) Easement for Pipes | 18 |
| 16. | Default; Remedies | 18 |
| 17. | Remedies Cumulative - Nonwaiver | 21 |
| 18. | Damage and Destruction and Eminent Domain | 21 |
| | (a) Damage and Destruction | 21 |
| | (b) Eminent Domain | 22 |
| 19. | Landlord's Lien | 22 |
| 20. | Financial Information; Statement of Tenant; Amendment of Lease | 22 |
| 21. | Assignment, Subletting and Hypothecation of Lease | 23 |
| 22. | Promotion of the Shopping Center | 25 |
| 23. | Notices | 26 |
| 24. | Holding Over | 26 |
| 25. | Subordination | 26 |
| 26. | Transfer of Landlord's Interest | 26 |
| 27. | Warranty | 26 |
| 28. | Commencement Agreement | 26 |
| 29. | Estoppel Certificate | 26 |
| 30. | Mechanics' Liens | 27 |
| 31. | Force Majeure | 27 |
| 32. | Limitation of Liability | 27 |
| 33. | Real Estate Brokers | 27 |
| 34. | Accord and Satisfaction | 27 |
| 35. | Nature and Extent of Agreement | 27 |
| 36. | Binding Effect | 28 |
| 37. | Venue | 28 |
| 38. | Jury Trial | 28 |
| 39. | Right of Redemption | 28 |
| 40. | Execution of Documents | 28 |
| 41. | Interpretation | 28 |

FOREVER 21, INC.

42.     Time of Essence ........................................................................................................... 29

43.     Independent Covenants ................................................................................................ 29

44.     Submission of Lease .................................................................................................... 29

EXHIBIT A - SITE PLAN ............................................................................................................ 31

EXHIBIT B - LEASING PLAN .................................................................................................... 32

EXHIBIT C - COMMENCEMENT AGREEMENT ..................................................................... 33

EXHIBIT D - INTENTIONALLY DELETED ............................................................................. 34

EXHIBIT E - ESTOPPEL CERTIFICATE .................................................................................. 35

EXHIBIT F - TENANT SIGN CRITERIA ................................................................................... 36

EXHIBIT G – INTENTIONALLY OMITTED.............................................................................. 40

EXHIBIT H - "VANILLA BOX"................................................................................................... 42

EXHIBIT I – EXISTING KIOSKS…………………………………………………………………….43

FOREVER 21, INC.

LEASE AGREEMENT

THIS LEASE AGREEMENT ("Lease"), made as of the _____ day of _____, 2018 by and between Allied Development of Alabama, LLC, an Alabama limited liability company, as the "Landlord", and Forever 21 Inc., a California corporation, hereinafter referred to as the "Tenant";

WITNESSETH:

The parties hereto agree for themselves, their successors and assigns, as follows:

1.    Basic Lease Provisions/Definitions.  The following terms, whenever used in this Lease with the first letter of each word capitalized, shall have only the meanings set forth in this paragraph, unless such meanings are expressly modified, limited or expanded elsewhere herein:

(a)    "Demised Premises":  Space numbers 808,810,811,814 & 818 as highlighted on Exhibit B with a total Floor Area of approximately 21,366 square feet.  {Section 2}

(b)    "Shopping Center":  That land owned by Landlord or Landlord's affiliate located in Baldwin County, Alabama, together with improvements constructed, or to be constructed, thereon on which the Demised Premises are located, which is illustrated on Exhibit A and known as Eastern Shore Centre.

(c)    "Common Areas":

(i)    The "Common Areas" as herein referred to, shall consist of all parking areas (including covered parking areas), landscaped areas, courts (including food courts), floors, ceilings, walls, benches, fountains, stairs, fire exits, windows, glass, doors and hardware, streets, sidewalks, malls, driveways, loading platforms, canopies, elevators, escalators, washrooms, staff offices, lounges and shelters of the Shopping Center, and other facilities available for common use, all as they may from time to time exist and be available to all the tenants in the Shopping Center, their employees, agents, customers, licensees and invitees.

(ii)    Landlord shall, subject to events beyond its reasonable control, maintain, or cause to be maintained, the Common Areas.

(d)    "Lease Term":  Ten (10) full Lease Years plus the period from the Term Commencement Date defined in Section 1(q), until the Rent Commencement Date defined in Section 1(s).

Tenant is hereby granted the right to renew this Lease for one (1) five (5) year renewal period (the "Option Term").  To exercise the Option Term, Tenant shall be required to give to Landlord written notice at least nine (9) months prior to the expiration of the Term, or the Lease Term; provided, however, if Tenant fails to timely exercise the Option Term, Tenant's right to exercise the Option Term shall not expire until thirty (30) days after written notice by Landlord of Tenant's failure to exercise same.

(e)    "Lease Year":  The first Lease Year shall commence on the Rent Commencement Date defined in Section l(s) and shall terminate on the first December 31 which is at least twelve (12) full calendar months thereafter.  Each subsequent Lease Year shall be a calendar year.

(f)    "Guaranteed Minimum Rent":

(i)    5% of Monthly Gross Sales, payable in equal monthly installments during the Lease Term.  {Section 4(a)}

(g)    "Percentage Rent":

(i)    One percent (1%) in addition to the Guranteed Minimum Rent for yearly Gross Sales in excess of Seven Million Dollars ($7,000,000.00) throughout the Lease Term.

(h)    "Permitted Use":  The Demised Premises shall be advertised and operated as a Retail Store under Tenant's Trade Name.  Tenant shall use the Demised Premises solely for the retail sale of womens and mens clothing, shoes and accessories and otherwise as a prototypical Forever 21 store.  Demised Premises shall not be used for any purpose not specifically set forth

FOREVER 21, INC.

herein, and no merchandise not specifically set forth herein will be displayed, sold, or offered for sale. {Section 6(a)}

     (i)    "Trade Name": Forever 21. {Section 6(a)}

     (j)    "Promotion/Marketing Fund and Media/Marketing Fund Fees":

          (i)    Promotion/Marketing Fund: $0 Dollars ($0.00) per square foot (per calendar year) including the first calendar year.

     (k)    "Common Area Costs": As used in this Lease, the term "Common Area Costs" means the total of all items of expense and cost relating to operating, managing, equipping, policing and protecting, lighting, repairing, replacing and maintaining the utility of the Common Areas in at least as good condition as when originally installed. Such costs and expenses shall include, but not be limited to, maintenance and repair of all parking areas (including covered parking areas), streets (including, without limitation, public streets and facilities to the extent that the same are the maintenance responsibility of the Landlord), removal of snow, ice, trash, garbage, rubbish, dirt and debris, all costs of seasonal decor, costs of planting, replanting and replacing landscaping and supplies required therefor, and all, costs of utilities used in connection therewith, including, but not by way of limitation, all costs of maintaining lighting facilities and storm drainage systems, maintenance, repair and depreciation of all items used in the operation and maintenance of the Common Areas, the costs of services offered to customers, management and labor salaries and benefits, security, all premiums for Workers' Compensation insurance, wages, unemployment taxes, social security taxes and personal property taxes and all premiums for other insurance carried by Landlord in connection with the Common Areas; fees for required licenses and permits and administrative costs equal to fifteen percent (15%) of the total costs of operating and maintaining the Common Areas. Notwithstanding anything to the contrary in this Lease, Tenant shall have no obligation during the Term to pay any Common Area Costs.

     (l)    "Landlord's Mailing Address":

Allied Development of Alabama, LLC
84 Modular Avenue
Commack, NY 11725
Attn: General Manager

"Tenant's Mailing Address":

Forever 21, Inc.
3880 North Mission Road
Los Angeles, CA 90031
Attn: Mr. Jatin Malhotra

"Place to Pay Rent": 84 Modular Avenue, Commack NY 11725.

     (m)    "Major Occupants": Stores within the Shopping Center which occupy at least forty thousand (40,000) square feet of Floor Area.

     (n)    "Floor Area": The number of square feet of floor space within the Demised Premises or other buildings or spaces in the Shopping Center, as the case may be. All Floor Areas shall be calculated by using dimensions from the centerline of the interior or party walls and from the exterior faces of exterior walls.

     (o)    "Gross Leased Area": The number of square feet of Floor Area of all leased areas of the Shopping Center rented to tenants whose leases or occupancy requirements have commenced, but excluding the Floor Area of the Major Occupants.

     (p)    "Exhibits": The following exhibits are attached to this Lease and are hereby incorporated in and made a part of this Lease.

          (i)    Exhibit A - Site Plan.

FOREVER 21, INC.

(ii)      Exhibit B - Leasing Plan.

(iii)     Exhibit C - Commencement Agreement.

(iv)      Exhibit D – Intentionally deleted.

(v)       Exhibit E - Estoppel Certificate.

(vi)      Exhibit F - Tenant Sign Criteria.

(vii)     Exhibit G - Intentionally Omitted.

(viii)    Exhibit H - Vanilla Box.

(ix)      Exhibit I – Existing Kiosks.

(q)      "Term Commencement Date":  The date on which Landlord tenders delivery of possession of the Demised Premises to Tenant. Landlord estimates such date to be June 1, 2018, but Landlord shall not be in default under this Lease or in any other way liable to Tenant, for any delay in delivery of the Demised Premises to Tenant and Tenant agrees to accept possession of the Demised Premises whenever made available by Landlord, notwithstanding the estimated date of delivery of possession.  Notwithstanding the foregoing or anything contrary in this Lease, in the event Landlord fails to deliver possession of the Premises to Tenant on or before June 1, 2018, then as Tenant's sole and exclusive remedy for Landlord's failure to deliver possession of the Premises to Tenant by such date (except as set forth below), Tenant shall be entitled to a one (1) day abatement of Guaranteed Minimum Rent payable under this Lease for each day after June 1 2018 that Landlord fails to deliver possession of the Premises to Tenant.  If Landlord has not delivered possession of the Premises to Tenant on or before September 1, 2018, then Tenant may terminate this Lease ("Sunset Termination Right") upon thirty (30) days' notice ("Sunset Termination Notice") to Landlord.  In the event Tenant elects to exercise its Sunset Termination Right, this Lease shall terminate on the date which is thirty (30) days after the date the Sunset Termination Notice is given, provided however, that if Tenant exercises the Sunset Termination Right and Landlord thereafter delivers possession of the Premises to Tenant within said thirty (30) day period, then such termination shall be null and void.

(r)      "Term Expiration Date":  The date that is the last day of the last  Lease Year after the Rent Commencement Date.

(s)      "Rent Commencement Date":        The earlier of (i) the date Tenant opens for business to the public from the Premises and (ii) one hundred twenty (120) days after Landlord delivers exclusive possession of the Premises to Tenant in the conditioned required by the Work Letter.

(t)      "Gross Sales":  As used in this Lease, the term "Gross Sales" means the full amount of gross sales, income, receipts, revenues, charges, monies or other things of value, of, in connection with and for all merchandise, services or other operations or businesses sold, leased, licensed, or rendered at, in from or arising out of the Demised Premises by Tenant or any subtenants, licensees or concessionaires, whether for cash or on a charge, credit or time basis, without reserve, deduction or offset for inability or failure to collect or trade ins, excess allowances on trade ins, coupons, handling charges for coupons or the equivalent, including, but not limited to such sales, leases, licenses and renderings:  (A) where orders originate and/or are received by Tenant in the Demised Premises but delivery or performance thereof is made from or at any place other than the Demised Premises; (B) pursuant to internet, mail, catalog, telegraph, telephone or other similar orders received or filled at or in the Demised Premises; (C) by means of mechanical, electronic and other vending machines in the Demised Premises; (D) where orders are accepted by means of electronic, telephonic, video, computer or other electronic or other technology based system whether existing now or developed in the future where customers' orders originate from the Demised Premises regardless of whether such orders are accepted or filled at the Demised Premises; (E) for the extension of credit to customers, including interest and similar charges for the extension of such credit; and (F) which Tenant in the normal and customary course of business would credit or attribute to its business upon the Demised Premises or any part or parts thereof, less refunds and allowances made on merchandise claimed to be defective or unsatisfactory or discounts to customers, provided that if such refunds, allowances or

FOREVER 21, INC.

discounts are in the form of credits to customers, such credits shall be included in Gross Sales when used.  Notwithstanding the foregoing, Gross Sales shall not include:

    (i)    the value of gift certificates sold so long as Tenant does not treat such transactions as a "sale" until such gift certificate is redeemed or converted into a sale by redemption, provided that the amount received from the sale or rental of goods, wares and merchandise, or for services performed on or off the Premises, that are paid for with such gift certificates (regardless of where acquired) shall be included in Gross Sales;

    (ii)    if after a sale has been included in Gross Sales it is claimed as a bad debt in a manner consistent with Generally Accepted Accounting Principles (GAAP) standards, the amount of said bad debt may be deducted from Gross Sales to the extent of the portion of said sale classified as or deemed bad debt (provided that in no event shall the aggregate amount of bad debt excluded from Gross Sales in any Lease Year exceed two percent (2%) of Gross Sales for the applicable Lease Year); however, if any portion of bad debt is received, recovered or realized then such portion shall be included in Gross Receipts in the Lease Year such portion is received, recovered or realized (as the case may be);

    (iii)    sales from vending machines located in non-sales areas of the Premises and provided solely for the benefit and use of Tenant's employees;

    (iv)    proceeds from the sale of Tenant's trade fixtures, equipment, machinery or furnishings not sold in Tenant's ordinary course of business and not stock in trade;

    (v)    discounts to employees (to the extent of the discount) in accordance with Tenant's then existing written employee discount program, provided such discounted amounts do not exceed an aggregate amount of two percent (2%) of Gross Sales in any Lease Year;

    (vi)    bulk sales of Tenant's inventory, not in the ordinary course of Tenant's business, to an independent third party for the purpose of clearing stock of old or obsolete merchandise;

    (vii)    alteration, workroom or delivery charges, provided any profit, income or revenue realized by Tenant for said charges shall be included in Gross Sales;

    (viii)    insurance proceeds from fire, casualty, or condemnation related to the Premises;

provided such sales have been included in Gross Sales and there shall be deducted from Gross Sales the sales price of merchandise returned by customers for exchange, provided that the sales price of merchandise delivered to the customer in exchange is included in Gross Sales.  Gross Sales shall not include the amount of any sales, use or gross receipts tax imposed by any federal, state, municipal or governmental authority directly on sales and collected from customers, provided that the amount thereof is separately added to the selling price and paid by Tenant to such governmental authority.  No franchise or capital stock tax and no income or similar tax based upon income or profits as such shall be deducted from Gross Sales in any event whatsoever.  Each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale shall be made, irrespective of the time when Tenant shall receive payment (whether full or partial) therefor.

A sale upon installment or credit shall be treated as a sale for the full price in the month during which such sale is made, regardless of when or whether Tenant shall receive payment therefor.

    (u)    "Guarantor": N/A.

References in this Section 1 to other sections are for convenience and designate one of the other sections where reference to the particular Basic Lease Provision appears.  Each reference in this Lease to any of the Basic Lease Provisions contained in this Section 1 shall be construed to incorporate all of the terms provided by such Basic Lease Provisions.  In the event of

any conflict between the Basic Lease Provisions and the balance of this Lease, including any exhibits, riders, addenda or amendments, then the balance of this Lease shall control.

2.    <u>Demised Premises</u>.  Landlord hereby leases to Tenant, and Tenant hereby accepts and rents from Landlord, at the rent, and upon the terms and conditions hereinafter set forth, the interior of the Demised Premises as described in Section 1(a), together with the nonexclusive right to use all Common Areas {as defined in Section 1(b)(i)} located from time to time in the Shopping Center.  Nothing contained in this Lease shall be construed as a grant, rental or conveyance of: (i) any rights in the roof or exterior of the building of which the Demised Premises constitute a part; (ii) the air space (occupied or not) above a horizontal plane coterminous with the bottom edge of the structural steel framework supporting the roof of the Demised Premises; (iii) the Common Areas (except as expressly provided in this Lease); (iv) the air space (occupied or not) below a horizontal plane coterminous with the finished floor level of the Demised Premises; or (v) the land upon which the Demised Premises are located.

3.    <u>Term</u>.  The Lease Term shall begin on the Rent Commencement Date, and shall end at midnight on the Term Expiration Date.

4.    <u>Rent</u>.  Tenant shall pay to Landlord for the use and occupancy of the Demised Premises and appurtenances thereto rent as hereinafter provided:

(a)    <u>Guaranteed Minimum Rent</u>.  Guaranteed Minimum Rent at the rate per annum specified in Section 1(d), payable in equal monthly installments as specified in Section 1(d) in advance estimates, without setoff or deduction (except as provided elsewhere in this Lease), on or before the first day of each and every calendar month beginning on the Rent Commencement Date and continuing throughout the Lease Term.  Changes in the Floor Area of the Demised Premises shall result in corresponding changes in the Guaranteed Minimum Rent and Percentage Rent Base.  Should the Rent Commencement Date be on a day other than the first day of a month, then the rent for the first fractional month shall be computed on a daily basis (based on the actual amount of days in such month) and shall be paid on the Rent Commencement Date.

(b)    <u>Taxes and Insurance Expense</u>. (**Not Applicable**).

(c)    <u>Percentage Rent</u>.  In addition to the Guaranteed Minimum Rent and other sums herein specified, Tenant shall also pay to Landlord a sum equal to the percentage of Gross Sales (which percentage is set forth in Section 1(g) hereof) of Tenant or any subtenants, licensees or concessionaires made from, in or upon the Demised Premises during each Lease Year in excess of the Percentage Rent Base set forth in Section 1(g).  Said Percentage Rent shall be computed each calendar month and, on or before the twentieth (20th) day of the calendar month immediately following the close of each such month, Tenant shall pay to Landlord the amount by which the sum so computed as a percentage of Gross Sales of Tenant during such month exceeds the Percentage Rent Base for such month.  If any Lease Year is longer or shorter than twelve (12) calendar months, then the Percentage Rent Base for that Lease Year shall be adjusted in proportion to the amount by which the Guaranteed Minimum Rent payable in that Lease Year is less or more than the annual Guaranteed Minimum Rent set forth in Section 1(f).

Within twenty (20) days after the end of each calendar month during the Lease Term, Tenant shall submit to Landlord an accurate written statement signed by Tenant or a duly authorized officer or representative of Tenant, showing the full amount of Gross Sales of Tenant during the immediately preceding month.  Within thirty (30) days after the end of each Lease Year, Tenant shall furnish to Landlord a statement certified by Tenant or an authorized officer or representative of Tenant showing in complete detail the Gross Sales made during the immediately preceding Lease Year or part thereof and the amounts paid to Landlord as Percentage Rent for said Lease Year.  If Tenant shall have paid to Landlord an amount greater than Tenant is required to pay as Percentage Rent for such Lease Year under the terms hereof, any excess of Percentage Rent that Tenant shall have paid for such Lease Year shall be applied against Guaranteed Minimum Rent next thereafter to become due Landlord as set forth in this Lease.  If Tenant shall have paid an amount less than the Percentage Rent required to be paid hereunder, then Tenant shall pay such deficiency to Landlord with such statement of Gross Sales.  All statements of Gross Sales shall be delivered to Landlord at the address specified in Section 1(l).

Each Lease Year shall be considered as an independent accounting period for the purpose of computing the amount of Percentage Rent.  If the first Lease Year is longer than twelve (12) full calendar months, then Tenant shall pay Percentage Rent for two (2) different periods for and during the first Lease Year as follows:  Tenant shall pay a separate Percentage Rent for that portion of the first Lease Year beginning on the Rent Commencement Date and ending on December 31 of that same year; and Tenant shall pay a separate Percentage Rent covering the remaining period of twelve (12) full calendar months of the first Lease Year.  Such amounts shall

FOREVER 21, INC.

be paid monthly as provided in the preceding paragraph. Tenant's statements of Gross Sales shall cover these two periods separately.

Tenant shall keep at all times during the Lease Term, at the Demised Premises, at Tenant's Mailing Address, or at a location made known to Landlord, full, complete and accurate books of account and records in accordance with generally accepted accounting practices for all operations of the business conducted in or from the Demised Premises, including the recording of Gross Sales and the receipt of all merchandise sold, and the delivery of all merchandise from, the Demised Premises during the Lease Term, and shall retain such books and records and copies of all sales tax reports and sales tax returns submitted to taxing authorities for at least three (3) years from the end of the period to which they are applicable, or, if any audit is required or a controversy should arise between the parties hereto regarding the rent, additional rent or other sums payable under this Lease, until such audit or controversy is terminated even though such retention period may extend beyond the expiration of the Lease Term or earlier termination of this Lease. Such books and records shall be open during Tenant's normal business hours upon ten (10) days notice during the aforesaid retention period to the inspection of Landlord or its duly authorized representatives who shall have full and free access to such books and records and the right to require of Tenant, its agents and employees, such information or explanation with respect to such books and records as may be necessary for a proper examination and audit thereof.

The acceptance by Landlord of payments of Percentage Rent shall not prejudice Landlord's right to audit Tenant's books, records and accounts in order to verify the amount of Gross Sales. If such audit discloses an understatement of Gross Sales, Tenant shall pay the deficiency in Percentage Rent with Interest thereon and, if Gross Sales have been understated in any annual report by four percent (4%) or more, Tenant shall pay to Landlord the cost of said audit plus an administrative fee of Three Hundred and No/100 Dollars ($300.00), in each case upon demand as Rent. If any annual report of Gross Sales understates the amount of Gross Sales by five percent (5%) or more, or, if any two (2) out of three (3) consecutive annual reports of Gross Sales understate the amount of Gross Sales by more than four percent (4%), then, in either such event, in addition to all other available remedies, Landlord may, but shall not be obligated to, terminate this Lease effective not, less than thirty (30) days after written notice to Tenant unless, within said thirty (30) day period, Tenant can show that any such error was an unintentional clerical error and that steps have been taken to assure that it does not recur.

(d)     Additional Rent.  In addition to all other rent required to be paid pursuant to the terms of this Section 4, Tenant shall pay, as additional rent, the sums required to be paid pursuant to other provisions of and exhibits to this Lease, whether or not designated "additional rent".  If such amounts or charges are not paid at the time provided in this Lease, they shall, nevertheless, be collectible as additional rent with the next or any future installment of Guaranteed Minimum Rent thereafter falling due, but nothing contained in this sentence shall be deemed to suspend or delay the payment of any amount of money or charge at the time the same becomes due and payable hereunder, or limit any other remedy of Landlord.

(e)     Interest and Late Charges.  If any payment of rent, additional rent or other amounts or charges of any kind or character due from Tenant provided in this Lease shall not be received by Landlord on the date due, such unpaid amounts shall bear interest at the rate of ten percent (10%) per annum from the date due to the date of payment.  In addition, if any monthly installment of Guaranteed Minimum Rent shall not be received by Landlord on the date which is five (5) days after the date due, a fee equal to Two Hundred Fifty and 00/100 Dollars ($250.00) shall be assessed against Tenant to compensate Landlord for administrative costs incurred as a result of Tenant's failure to pay the Guaranteed Minimum Rent.

(f)     Payment of Rent.  All rent and additional rent payments provided for in this Lease shall be made payable to Landlord at the address specified in Section 1(n), until notice to the contrary is given by Landlord.  Rent shall be deemed paid when received by Landlord.

(g)     Survival.  The rights and obligations of Landlord and Tenant set forth in this Section 4 shall survive the expiration or earlier termination of this Lease.

(h)     Co-Tenancy.  If either (i) at the time of Tenant's opening from the Demised Premises for business to the public, Victoria's Secret is not open and operating, or (ii) at any time and from time to time during the term of this Lease after Tenant's initial opening and while Tenant is operating its store within the Premises in accordance with this Lease and is not otherwise in default beyond any applicable cure period of any of the terms, covenants or conditions required to be observed or performed by Tenant under this Lease, (A) Belks and Shoe Station (and after the initial term of this Lease, any replacement anchor tenants reasonably acceptable to Tenant) or (B) tenants representing less than seventy percent (70%) of the gross leasable area of the Shopping Center (excluding square footage occupied by or allocated to

FOREVER 21, INC.

anchor stores and by the Demised Premises) are open for business and operating in the Shopping Center for reasons other than fire, force majeure or other casualty (the "Co-tenancy Threshold"); then, in the case of either (i) or (ii), Tenant shall have the right to pay to Landlord Alternative Rent (as hereinafter defined), in lieu of Guaranteed Minimum Rent and Percentage Rent, if any, during each month (and each partial month, if any) the Co-tenancy Threshold remains unsatisfied. If the Co-tenancy Threshold is not met by Landlord, Alternative Rent shall be deemed to be Fixed Annual Minimum Rent and Percentage Rent, if any, for all purposes under this Lease, including without limitation Article 15 of this Lease. Upon satisfaction of the Co-tenancy Threshold, Tenant shall resume paying Landlord Guaranteed Minimum Rent and Percentage Rent, if any, as otherwise provided in this Lease (including but not limited to any adjustments to Guaranteed Minimum Rent that may have occurred pursuant to Section 1(f) of this Lease, or any adjustments to Percentage Rent that may have occurred pursuant to Section 1(g) of this Lease (if any) during the period the Co-tenancy Threshold was unsatisfied). Whenever used in this Section 4(h), the term "anchor store" shall be deemed to mean a premises in the Shopping Center containing not less than fifty thousand (50,000) contiguous square feet of floor area operating under a single trade name.

(i)     If Tenant is on Alternative Rent for twelve (12) months, then within thirty (30) days following the end of such twelve (12) months, Tenant may, at its discretion, terminate the Lease upon thirty (30) days' notice to Landlord. If Tenant elects to terminate this Lease pursuant to this Section 4(f), then this Lease shall terminate at the end of said notice period without any additional action or notice by the terminating party. If Tenant elects not to terminate this Lease pursuant to this Section 4(h), then it shall be deemed that Tenant irrevocably and unconditionally agrees to begin paying the Guaranteed Minimum Rent as set forth in Section 1(f) of the Lease and Percentage Rent, if any, as set forth in Section 1(g) of this Lease, and forfeit its right to Alternative Rent in which event Tenant shall immediately resume paying such Guaranteed Minimum Rent and Percentage Rent, if any, from the date which is the first anniversary of the date Tenant was eligible to pay Alternative Rent (i.e. the date which immediately follows the end of the twelfth (12th) month Tenant is on Alternative Rent as set forth above).

(ii)     The term "Alternative Rent" means an amount which is the lesser of (i) the amount equal to two percent (2%) of Tenant's Gross Sales achieved during each month (and each partial month, if any) the Co-tenancy Threshold remains unsatisfied or (ii) the amount equal to the Guaranteed Minimum Rent and Percentage Rent which would have been due that month if the Co-tenancy Threshold had been satisfied. Each such payment of Alternative Rent payable under this Lease (if any) shall be made, without diminution, deduction or set-off whatsoever and without prior notice or demand, within twenty (20) days after the end of each month (and each partial month, if any) until such time as the Co-tenancy Threshold is again satisfied, and shall be accompanied by Tenant's statement of Gross Sales collected during the previous month pursuant to Section 3.05 hereof.

(iii)     Nothing in this Section 4(f) shall relieve Tenant of its obligation to pay any other Additional Rent due under this Lease, or otherwise modify any of Tenant's other obligations under this Lease. The rights and remedies of Tenant under this Section 4(f) are and shall be the sole and exclusive remedy of Tenant if Landlord fails to satisfy the Co-Tenancy Threshold during the term of this Lease.

(i)     In the event Gross Sales for any twelve (12) month period (January 1 through December 31) following the sixtieth (60th) full calendar month of the Term of this Lease (a "Performance Period") does not exceed Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00), then provided (i) this Lease is then in full force and effect, (ii) Tenant is not then in breach of any of the terms, covenants or conditions required to be observed or performed by Tenant under this Lease (beyond all applicable notice and cure periods), and (iii) Tenant has timely submitted to Landlord a statement of Gross Sales for the applicable Performance Period; then Tenant may, at its option, terminate this Lease by giving Landlord written notice of termination of this Lease within ninety (90) days after the last day of the applicable Performance Period. If such a notice of termination of this Lease is timely and properly given by Tenant to Landlord, then this Lease shall terminate upon the last day of the sixth (6th) month following the Performance Period (the "Performance Termination Date"), without any further action by Tenant or notice to Landlord, and from and after such date Tenant shall have no right, title or interest in or to the Premises. If Tenant does not give Landlord notice of termination of this Lease within the ninety (90) day time period set forth above, then

Tenant shall have no further right to terminate this Lease with respect to such Performance Period, but shall continue to have such termination right for any subsequent Performance Period.

5.    Improvements and Delivery of Demised Premises.

(a)    Except for Landlord's Work, any latent defects discovered by Tenant within one year after Landlord's delivery of the Premises to Tenant, and any pre-existing Hazardous Materials, Landlord shall deliver the Demised Premises to Tenant "as is" and shall have no duty to make any modifications or improvements to the Demised Premises.  Landlord makes no representations or warranties with respect to the condition of the Demised Premises except as may be set forth in this Lease.  By occupying the Demised Premises after the Term Commencement Date, to install fixtures, facilities or equipment or to perform finishing work, or for any other purpose, Tenant shall be deemed to have accepted the same.

(b)    Upon delivery of possession of the Demised Premises by Landlord, Tenant shall, upon obtaining any and all permits, licenses and approvals with respect to Tenant's Work or its intended operations at the Leased Premises, and subject to Landlord timely approving Tenant's plans and specifications for its work at the Leased Premises, with due diligence proceed to finish-out the Demised Premises (if the Demised Premises is in the form of a shell) or remodel and renovate the Demised Premises (if the Demised Premises is a previously finished-out space), installing such stock, fixtures and equipment, obtaining required utilities and performing such other work as shall be necessary or appropriate for the operation of its business ("Tenant's Work"), all in accordance with plans and specifications approved by Landlord as specified below and as described in the Tenant Design & Construction Criteria Manual (the "Criteria") for the Shopping Center. Landlord has delivered the Criteria to Tenant and Tenant acknowledges receipt thereof. Tenant shall complete all such work so that Tenant shall open for business in the Demised Premises on the Rent Commencement Date.  Tenant agrees to submit to Landlord within thirty (30) days after execution of this Lease plans and specifications covering all work and installations which Tenant proposes to do in the Demised Premises, including, without limitation, interior store layout, storefront, mechanical layout, fixtures and decor, all of which shall be in accordance with generally accepted construction standards for a first class shopping mall and in accordance with the Criteria. Tenant agrees not to commence work upon any of Tenant's Work until Landlord has approved Tenant's plans and specifications in writing. Tenant's Work shall comply with all applicable laws, ordinances, and regulations.  During construction, Tenant shall not unreasonably interfere with the conduct of business at the Shopping Center or with any other tenant's business at the Shopping Center.  Tenant shall provide temporary construction barriers to control and retain noise, dust or other materials within the Demised Premises. All waste, garbage and debris resulting from any work performed by Tenant or Tenant's contractors or subcontractors shall be removed from the Demised Premises and the Shopping Center at Tenant's sole cost and expense. Upon completion of construction of improvements, Tenant shall deliver to Landlord two (2) sets of "as-built" plans for the Demised Premises and a copy of Tenant's Certificate of Occupancy.

Tenant acknowledges that the financial success of the Shopping Center depends, in part, on both (i) the completion of the remodel or construction of the Demised Premises on or before the Rent Commencement Date and (ii) Tenant's opening for business on or before the Rent Commencement Date, and that Landlord's damages arising from Tenant's failure to do so are impossible or impracticable to measure. Therefore, if Tenant fails to open the Demised Premises for business on or before the date that is sixty (60) days after the Rent Commencement Date, Tenant shall pay to Landlord, upon receipt of invoice, and as Landlord's sole remedy for such failure by Tenant, a sum equal to twenty five percent (25%) of 1/365ths of the monthly Guaranteed Minimum Rent for each and every business day after such sixtieth (60th) day after the Rent Commencement Date that Tenant has failed to open for business., which Tenant agrees is fair compensation to Landlord for said damages.

(c)    Landlord makes no representations as to the period or periods that the Major Occupants or any other tenant in the Shopping Center will be open for business, and this Lease will not be affected by any closing of any such business.

6.    Use of the Demised Premises.

(a)    Continuous Occupancy.  The Demised Premises shall, during the Lease Term, be used and occupied only for the Permitted Use specifically set forth in Section 1(h) of this Lease and operated only under the Trade Name specifically set forth in Section 1(i) of this Lease, and for no other purposes and under no other name, without the written consent of Landlord; provided, however, Tenant shall have the right to change its Trade Name from time to time without Landlord's consent provided that (i) the use of the Trade Name shall not violate any

FOREVER 21, INC.

existing lease or other agreement affecting the Shopping Center, (ii) the Trade Name shall not be substantially similar to the trade name of any other existing tenant or occupant of the Shopping Center and (iii) the Trade Name is the trade name used by all or substantially all of the other stores operated by Tenant which are located within the southeastern United States, including Alabama.  Tenant shall keep the Demised Premises continuously open and operate for business during the Lease Term between the hours of 10:00 a.m. and 9:00 p.m., six days per week, and between the hours of 12:00 p.m. and 6:00 p.m. on Sundays, or such different hours as shall be prescribed by Landlord, provided Landlord imposes those different hour requirements on a numerical majority of the tenants of the Shopping Center.  Notwithstanding the foregoing, Tenant may cease operations in the Premises (i) due to fire or other casualty, or (ii) due to force majeure, or (iii) due to Tenant's periodic remodeling for not more than five (5) days in any one-year period (and provided Tenant shall have notified Landlord of the estimated commencement and completion dates for the remodeling at least ten (10) days' prior to Tenant's commencement thereof).  Further, Tenant shall not be required to operate on any holiday that the Shopping Center is closed, and the following, to the extent that Tenant now or hereafter customarily observes for the majority of Tenant's stores in New York: Easter Sunday, Thanksgiving Day, and Christmas Day.  Upon at least seven (7) days' prior written notice to Landlord, Tenant shall be permitted to close for two (2) days every six (6) month period for conducting inventory and such other business purposes as Tenant may require.  Tenant's obligation to open for business shall be subject to governmental regulations or governmental recommendations with which Tenant hereby agrees to comply.  Tenant shall install and maintain in the Demised Premises store fixtures of high quality and shall, after the Rent Commencement Date, continuously, actively and diligently operate its business in the whole of the Demised Premises in reputable manner throughout the Lease Term consistent with the majority of other stores operated by Tenant as of the date hereof, maintaining in the Demised Premises a full staff of employees and a full and complete stock of merchandise, and in general employ its best business judgment, efforts and abilities to operate its business in an efficient and businesslike manner, to the end that the maximum volume of sales which can be reasonably produced in the Demised Premises shall be realized under the Trade Name set forth in Section 1(i).  Under no circumstances shall the Demised Premises be used for any of the following purposes:

> (i)     the sale or distribution of alcoholic beverages for consumption on or off the Demised Premises, unless first approved in writing by Landlord; or

> (ii)     the sale of merchandise from vending machines, without the prior written consent of Landlord, except vending machines installed for sales to employees only; or

> (iii)     the operation of coin or token operated video games or machines of a similar nature; or

Intentionally Omitted

(b)     <u>Violation of Laws</u>.  Tenant shall not use or suffer or permit to be used the Demised Premises or any part thereof in violation of any law or ordinance or any regulation of any governmental authority or in any manner that will constitute a nuisance, or that will injure the reputation of the Shopping Center or any part thereof, or for any hazardous purpose.

(c)     <u>Rules and Regulations</u>.  Tenant shall, before opening for business in the Demised Premises, comply in all respects with the Criteria.  In addition, during the Lease Term, Tenant agrees:

> (i)     To take possession and open for business, as required hereby; and, to keep its display windows, including windows and shadow boxes in the Demised Premises, dressed and illuminated and its interior mall signs and lights suitably lighted during such hours as a majority of other tenants are similarly required, but in no event later than 11:01 p.m., except for special promotional events approved or sponsored by Landlord.

> (ii)     To keep the Demised Premises, including all vestibules, entrances and returns located therein, all improvements thereon, and all windows, doors and glass or plate glass fixtures, in a safe, neat and clean condition at all times. The attachment of advertising to plate glass, storefronts, doors and/or windows is prohibited.  Tenant shall not locate or place any fixtures, signs or merchandise within the first three (3) feet of any entrance to

FOREVER 21, INC.

the Demised Premises, nor within one (1) foot of any store window of the Demised Premises.

(iii)    To store or stock in the Demised Premises only such goods, wares, merchandise, or other property as shall be reasonably required in connection with Tenant's business in the Demised Premises.

(iv)    To use for offices, clerical or other non selling purposes only such space in the Demised Premises as is from time to time reasonably required for Tenant's business therein.

(v)    To store all trash and garbage in adequate containers within the Demised Premises, maintained in a neat and clean condition and located as Landlord shall from time to time designate, and so as not to be visible to the public in or outside the Shopping Center and so as not to create or permit any health, safety or fire hazard, and arrange for regular removal thereof at Tenant's expense.  If Landlord requires the same, all garbage and trash must be compacted in the manner and in a location in or outside the Demised Premises as reasonably required by Landlord.

(vi)    Not to burn any papers, trash or garbage of any kind in or about the Demised Premises or the Shopping Center.

(vii)    Not to use or operate any equipment, fixtures or machinery which unreasonably disturbs other tenants or customers in the Shopping Center.

(viii)    Not to use the plumbing facilities for any purpose other than that for which they were constructed and not to dispose of any damaging or injurious substance therein.

(ix)    Not to distribute any handbills or other advertising matter on or about any part of the Shopping Center outside the Demised Premises.

(x)    Not to advertise any going out of business, removal, fire, bankruptcy, auction or other distress sale on the Demised Premises.  If any such covenant by Tenant is deemed unlawful, then no such activity shall be so conducted, unless and until satisfactory proof has been supplied to Landlord that the person intending to conduct such sales has complied with all legal requirements, including without limitation any applicable rules and regulations of the Federal Trade Commission.

(xi)    Not to use any sidewalks, walkways or other Common Areas of the Shopping Center, for the keeping, displaying, advertising and/or sale of any merchandise or other object.

(xii)    Not to install on or about the Demised Premises any exterior lighting, amplifiers or similar devices, and not to use in, on or about the Demised Premises any advertising medium which may be heard or experienced outside the Demised Premises, such as flashing lights, search lights, loudspeakers, phonographs, television or radio broadcasts, without Landlord's consent.

(xiii)    Not to install a television antenna outside the Demised Premises without Landlord's written consent.  If Tenant is permitted to connect with any master antenna provided by Landlord, Tenant shall furnish and install any and all wiring and booster systems related to such connection and the operation within the Demised Premises of television receivers, and Tenant shall pay to Landlord such reasonable connection and/or subscription charges as Landlord may establish.

(xiv)    To keep the Demised Premises clean, orderly, sanitary and free from objectionable odors and from termites, insects, vermin and other pests, and not to keep any live animals of any kind in, upon or about the Demised Premises.  Any program of extermination and the company or person performing the same shall be subject to Landlord's approval, not to be unreasonably withheld.  If Landlord establishes any pest, vermin or other extermination program for all or part of the Shopping Center, it may require Tenant to participate in such program; and Tenant covenants to reimburse

FOREVER 21, INC.

Landlord the reasonable cost thereof as estimated by Landlord, including, but not limited to Landlord's reasonable expense in administering the program.

(xv)    To comply with any and all requirements of any of the constituted public authorities, and with the terms of any state or federal statute or local ordinance or regulation applicable to Tenant or its specific use of the Demised Premises.

(xvi)    To give to Landlord immediate verbal notice followed by prompt written notice of any accident, fire or damage occurring on or to the Demised Premises.

(xvii)    To perform all loading and unloading of goods only at such times, in the areas and through such entrances as may be reasonably designated for such purposes by Landlord.  Trailers and/or trucks servicing the Demised Premises shall follow such routes in the Shopping Center as are reasonably designated by Landlord and shall remain parked in designated areas of the Shopping Center as from time to time reasonably required by Landlord.

(xviii)    To require Tenant's employees to park their vehicles only in those portions of the parking area or at such other places as are reasonably designated for that purpose by Landlord from time to time.  Tenant agrees that at least five (5) days prior to its opening for business in the Shopping Center and from time to time thereafter, within five (5) days after receipt of written notice from Landlord, it will furnish Landlord with the State license numbers assigned to Tenant's employees' vehicles applicable to the Premises.  Tenant authorizes Landlord, upon reasonable notice, to remove any employee's vehicle not parked in a designated area and to have such vehicle placed in the designated area, or removed from the shopping center property, with Tenant or its employee to bear the reasonable expense of such towing.  In the event of a failure to park in the portion of the parking area designated by Landlord as aforesaid (whether or not the vehicle of an offending employee is towed) or failure of any employee of Tenant to place identification provided by Landlord on his vehicle, Tenant agrees to pay Landlord as additional rent Ten and No/100 Dollars ($10.00) per vehicle for each day such violation continues.

(xix)    To comply with all reasonable non-discriminatory rules and regulations of Landlord in effect at the time of the execution of this Lease, or at any time or times and from time to time promulgated by Landlord, which Landlord shall deem necessary for the proper operation of the Shopping Center, all in accordance with good standards for the operation of a regional shopping center, including, but not limited to, the installation of such fire extinguishers and other safety equipment as Landlord may reasonably require; it being understood that Landlord may except Major Tenants from compliance with all or part of the rules and regulations.

(d)    Installation of Signs, Awnings, Canopies, Fixtures and Alterations by Tenant.  All fixtures installed by Tenant shall be new or like-new.  After the completion of Tenant's Work, Tenant shall not alter the Demised Premises, or any part thereof, and shall not install or affix any sign, device, fixture or attachment on or to the exterior of the Demised Premises, or any building or any part thereof on the Demised Premises, including the roof or the canopy thereof, nor place any vents, structure, building, improvements, sign or advertising device, or obstruction of any type or kind upon the Common Areas or upon the Demised Premises without first obtaining Landlord's written consent and complying in all respects with the provisions of the Criteria, unless Landlord consents to the contrary in writing.  If Tenant shall do any of the foregoing acts in contravention of this Section 6(e), without limiting any other remedy Landlord may have therefor under this Lease, in law or in equity, Landlord shall have the right, after expiration of any applicable notice and cure periods pursuant to this Lease, to remove any such decoration, paint, alteration, sign, device, fixture or attachment and restore the Demised Premises or the Common Areas to the condition thereof prior to such act.  The cost of such removal and restoration shall be paid by Tenant to Landlord as additional rent within thirty (30) days after written demand.  Tenant shall maintain all signs, whether located within the Demised Premises or on the storefront of the Demised Premises, in good condition, repair and operating order (including light replacement) at all times and any damage thereto shall be repaired .  If requested by Landlord, Tenant agrees to remove any and all furnishings, equipment, trade fixtures and personal property from the Demised Premises at the expiration or earlier termination of the Lease Term.  Notwithstanding the foregoing, Tenant shall be permitted to make interior non-structural, non-storefront alterations, additions and/or improvements to the Premises without obtaining

FOREVER 21, INC.

Landlord's prior approval and consent, so long as: (i) the cost and expense of such alterations, additions and/or improvements do not exceed Fifty Thousand and 00/100 Dollars ($50,000.00) in the aggregate in any Lease Year, and (ii) such alterations, additions and/or improvements are performed by Tenant in accordance with any applicable law, and Landlord's Shopping Center rules and regulations.

Landlord shall provide Tenant with billboard marketing, pursuant to Tenant's specifications, on the billboard located on I-10 Interstate Highway at no cost to Tenant (i) exclusively on such billboard for one (1) year commencing upon Tenant's opening for business from the Demised Premises and (ii) during the Term so long as Landlord or an affiliate of Landlord owns the Shopping Center.  Landlord shall also provide exterior signage and interior signage in locations in the Shopping Center approved by Tenant pursuant to Tenant's plans and specifications.

(e)    Hazardous Materials.  Tenant shall not use, generate, manufacture, produce, store, release, discharge or dispose of on, in, under or about the Demised Premises or the Shopping Center, or transport to or from the Demised Premises or Shopping Center, any Hazardous Materials (as defined below), or allow any other person or entity under its control to do so.  Tenant shall comply with all applicable Environmental Laws (as defined below) with respect to its use and occupancy of the Demised Premises and Shopping Center, except that Landlord shall be responsible for any Hazardous Materials which (i) existed on, in, under or about the Demised Premises and the Shopping Center prior to the Rent Commencement Date, or (ii) were not caused by Tenant or its employees, agents or contractors.  Should Landlord be required to remove any Hazardous Materials generated by Tenant from the Demised Premises or the Shopping Center, Tenant shall promptly pay to Landlord, upon demand, all costs of such removal.

Tenant shall promptly notify Landlord should Tenant receive notice of, or otherwise become aware of, any presence, release or discharge, or threatened release or discharge, of any Hazardous Material in, on, under or about the Demised Premises or the Shopping Center, or any violation of any Environmental Law with respect to the Demised Premises or the Shopping Center.  Tenant agrees to indemnify, defend and hold harmless Landlord, and its respective principals, owners, agents, managers, employees, successors and assigns from and against any and all liabilities, claims, demands, damages, liens, penalties, costs and expenses of every kind and nature directly or indirectly attributable to Tenant's failure to comply with this Section 6(f), including without limitation reasonable attorneys' fees and expenses, court costs and costs incurred in the investigation, settlement and defense of claims.  This indemnity obligation shall survive the expiration of the Lease Term or the earlier termination of this Lease.

Landlord agrees to indemnify, defend and hold harmless Tenant, and its respective principals, owners, agents, managers, employees, successors and assigns from and against any and all liabilities, claims, demands, damages, liens, penalties, costs and expenses of every kind and nature directly or indirectly attributable to Landlord's failure to comply with this Section 6(f), including without limitation reasonable attorneys' fees and expenses, court costs and costs incurred in the investigation, settlement and defense of claims.  This indemnity obligation shall survive the expiration of the Lease Term or the earlier termination of this Lease.

As used in this Section 6(f), "Hazardous Material" means any substance or material meeting any one or more of the following criteria: (i) it is or contains a substance designated as a hazardous waste, hazardous substance, hazardous material, pollutant, contaminant or toxic substance under any Environmental Law; (ii) it is toxic, reactive, corrosive, ignitable, infectious or otherwise hazardous; or (iii) it is or contains, without limiting the foregoing, petroleum hydrocarbons.  As used herein, "Environmental Law" shall mean any federal, state or local law, statute, ordinance, rule, regulation, permit, directive, license, approval, guidance, interpretation, order, or other legal requirement relating to the protection of safety, human health or the environment.

7.    Landlord's Covenant to Maintain.  Landlord shall maintain the exterior and structural components of the Shopping Center, including but not limited to the floor slab, and all utility lines and systems located outside of the Leased Premises and/or which do not exclusively serve the Premises. Landlord shall, during the Lease Term, maintain and make necessary repairs to the exterior and principal structural portions of the buildings and other improvements constituting the Shopping Center; provided, however, that Landlord will not be responsible for or required to make, and Tenant will make, any repairs which may have been occasioned or necessitated by the gross negligence or willful misconduct of Tenant, its agents, or employees. Landlord shall not be liable for any damages resulting from its failure to make repairs, unless such failure continues beyond a reasonable time after receipt of notice of the necessity for such repairs.

8. <u>Tenant's Covenant to Maintain</u>. Tenant shall keep and maintain in good order and repair, at its sole cost and expense, all parts of the Demised Premises, including without limitation, the entire interior thereof and all window glass, plate glass, non-structural components of the storefront, and those portions of the plumbing, wiring, electrical systems and central heating and air conditioning systems exclusively serving the Demised Premises.

Tenant shall maintain all heating and air conditioning equipment located within, and exclusively serving, the Demised Premises, and shall keep in force a standard maintenance agreement on all such equipment and provide a copy of said maintenance agreement to Landlord upon reasonable request. All parts of the interior of the Demised Premises shall be painted or otherwise decorated by Tenant when reasonably necessary. Tenant will surrender the Demised Premises at the expiration or earlier termination of this Lease in as good condition as when initially completed, excepting only deterioration caused by reasonable wear and tear, casualty and condemnation, and except as expressly provided to the contrary in this Lease. All replacements and modifications which are a part of the Demised Premises made by Tenant to the Demised Premises shall become the property of Landlord at the end of the Lease Term, subject to the other provisions of this Lease.

Except as specifically provided in Section 7 or Section 13 herein, Landlord shall have no obligation to repair, maintain, alter, replace or modify the Demised Premises or any part thereof, or any plumbing, heating, electrical, air conditioning or other mechanical installation therein, or serving same. Under no circumstances shall Landlord be obligated to repair, replace or maintain any windows, doors, plate glass or door or window glass, except when and to the extent of proceeds received from Landlord's fire, extended coverage or other hazard insurance, or to the extent required due to Landlord's, or its agents, employee's or contractor's, negligence or willful midsconudct.

9. <u>Common Areas</u>.

The Common Areas shall at all times be subject to the exclusive control and management of and Landlord expressly reserves the right to make alterations, reductions or additions thereto including, without limitation: (i) changes to the location, arrangement or grade level of the parking areas or other Common Area facilities; (ii) construction of elevated parking areas and facilities; (iii) establishment and enforcement of charges for customer parking; (iv) establishment and enforcement of reasonable non-discriminatory rules and regulations restricting parking by Tenant and the other occupants of the Shopping Center, and their respective employees, agents and contractors, to designated areas; (v) temporary closings of any portion of the Common Areas for repair or construction work or to prevent a public dedication thereof, (vi) action to discourage non customer parking; (vii) relocation of vehicular and pedestrian routes around, through and across the Common Areas; (viii) construction of traffic control devices; (ix) the right from time to time to expand, reduce and otherwise change the size and dimensions of the Shopping Center; locate, relocate, alter and change the number and location of buildings and other improvements; change any building dimension, and the number of floors in any of the buildings, parking areas, identity and type of other stores, tenancies, shopping center name and the Common Areas located from time to time in or on the Shopping Center; Landlord further reserves the use of the exterior walls (other than storefronts), the roof, and the right to install, maintain, use, repair and replace pipes, ducts, conduits, and wires leading through the Premises in locations which will not materially interfere with Tenant's use thereof and which serve other parts of the Shopping Center; Landlord shall use reasonable efforts to locate such items under the floor, above the suspended ceiling, if any, adjacent to an interior wall other than the storefront and (to the extent reasonably practical) in a non-sales area; Landlord also reserves the right to use the land below and the space above the Premises in any manner and for any purpose which does not materially or permanently interfere with Tenant's use of the Premises; and, (x) any other act in or to the Common Areas as shall be consistent with good business practices as determined by Landlord in Landlord's commercially reasonable discretion. In exercising Landlord's foregoing rights, and notwithstanding anything to the contrary in this Lease, Landlord shall not: (i) unreasonably affect or obstruct access to, or visibility of, the Demised Premises; or (ii) reduce available parking areas to less than the parking areas required by applicable law; or (iii) unreasonably interfere with Tenant's operation of its permitted use of the Premises. Notwithstanding anything to the contrary in this Lease, no kiosk that is not in place as of the date of this Lease (and replacements of existing kiosks, which replacements shall not exceed the height or width of the kiosk which is being replaced), which existing kiosks are show on Exhibit I attached hereto, shall be erected.

Landlord may, but shall not be required during the Lease Term, to perform renovation or remodeling work in and to the Shopping Center including the mechanical systems serving the Shopping Center (which work may include, but not necessarily be limited to: (i) the repair, replacement, or renovation of the exterior or interior of the building and its mechanical, electrical, plumbing, HVAC or sprinkler systems; (ii) repair, replacement, renovation and/or rearrangement of the Common Areas; and (iii) relocation of any auto or pedestrian entrance to the Shopping Center). Tenant agrees that: (a) Landlord shall have access to the Demised Premises at all reasonable times, upon three (3) days verbal or written notice to Tenant's on site store manager, for the purpose of performing any work necessary to further Landlord's work; and (b) except as set forth below, Landlord shall incur no liability to Tenant, nor

FOREVER 21, INC.

shall Tenant be entitled to any abatement of rent on account of any noise, vibration, or other disturbance to Tenant's business at the Demised Premises which shall arise out of said access by Landlord to the Demised Premises or by the performance by Landlord of any renovation or remodeling work at the Shopping Center. If Tenant's customers are denied access to the Demised Premises or Tenant's visibility or other access to the Premises is adversely affected, and, as a result, Tenant is unable to conduct business in the normal course in the Demised Premises for twenty four (24) hours or more, there shall be a full abatement of Guaranteed Minimum Rent, on a pro rata basis, based upon the number of days Landlord is in violation of this provision.

10.    Utilities.  During the Lease Term, Tenant shall be solely responsible for and promptly pay all utility environmental charges, as additional rent, for separately metered electricity, water and sanitary sewer including all treatment facility charges, if any, garbage disposal and any other utility or services used or consumed in the Demised Premises including applicable taxes if any. Tenant's payments to the Landlord for unmetered utility services shall be the lesser of: (a) Landlord's reasonable estimate of Tenant's consumption using the Tenant's contract rate with the utility if purchased directly; or (b) Landlord's reasonable estimate of Tenant's consumption using the utility's rate applicable to the Shopping Center.

Tenant agrees to operate and keep in good working order any separate and exclusive heating and air conditioning unit in the Demised Premises during all hours that Tenant's store is open for business. Tenant agrees to operate the exclusive heating and air conditioning unit in the Demised Premises as required to meet Tenant's specific needs without removing excessive air or draining conditioned air from Landlord's common system, if any. Landlord reserves the right to, at Landlord's sole cost and expense, install energy management equipment attached to, monitoring and controlling the Tenant HVAC system and other electrical devices as part of the overall energy conservation effort of the Shopping Center to control demand.

Landlord shall not be liable to Tenant for any damages should the furnishing of any utilities be interrupted or required to be terminated because of necessary repairs or improvements, action of public authority, strikes, acts of God or the public enemy, or any cause beyond the reasonable control of Landlord nor shall any such interruption or cessation relieve Tenant from the performance of any of Tenant's covenants, conditions and agreements under this Lease, except when such interruption or termination is due to Landlord's (or its agent's, employee's or contractor's) negligence or willful misconduct, or when such interruption last for more than forty-eight (48) hours after which Tenant may abate rent owing under this Lease until such interruption is removed.

11.    Laws and Insurance Standards.  Tenant shall, during the Lease Term, at Tenant's sole cost and expense, promptly comply with all laws, ordinances, rules, regulations, directives and standards of all federal, state, county and municipal governments and all departments and agencies thereof having jurisdiction over the Demised Premises now or hereafter in effect with respect to Tenant's specific use of the Demised Premises. Tenant shall, at Tenant's sole cost and expense, make all non-structural changes to the Demised Premises which are or hereafter may be required in order to comply with the foregoing.

12.    Indemnification.

(a)    Tenant shall indemnify, protect, defend and hold Landlord harmless from claims, actions, damages, liabilities and expenses (including reasonable attorneys' fees and court costs) in connection with loss of life, bodily or personal injury or property damage: (i) arising from or out of any occurrence in, upon, at or from the Demised Premises and caused by the willful acts of Tenant or its agents, contractors, employees, licensees or concessionaires and when not a result of any negligent, grossly negligent, or intentional act or omission of Landlord, its agents, contractors, employees or any person or entity with which Landlord contracts to manage the Shopping Center; or (ii) resulting from a breach of this Lease by Tenant. For purposes of this subsection 12(a), the term "Landlord" shall include its partners, members, managers, shareholders, officers, directors and employees, as applicable, as well as any person or entity with which Landlord contracts to manage the Shopping Center.

(b)    Except as designated as Tenant's obligations in Section 12(a), Landlord shall indemnify, protect, defend, and hold Tenant harmless from claims, actions, damages, liabilities and expenses (including reasonable attorneys' fees and court costs) in connection with loss of life, bodily or personal injury or property damage: (i) arising from or out of any occurrence in, upon, or at or from the Common Areas and caused by the willful acts of Landlord or its employees, agents or contractors and when not a result of any negligent, grossly negligent, or intentional act or omission of Tenant, its agents, contractors, employees, licensees or concessionaires; or (ii) resulting from a breach of this Lease by Landlord.

(c)    If either party receives notice of a claim that is subject to indemnification under this Section 12, the indemnified party shall give notice to the indemnifying party as soon as

FOREVER 21, INC.

reasonably practical. The indemnified party shall permit the indemnifying party, at its expense, to assume the defense of any such claim by counsel selected by the indemnifying party and reasonably satisfactory to the indemnified party, and to settle or otherwise dispose of the same; provided, however, that the indemnified party shall have the right to participate in such defense at its expense. Notwithstanding the foregoing, the indemnifying party shall not, without the prior written consent of the indemnified party, consent to the entry to any judgment, or enter into any settlement, unless such judgment or settlement provides only for the payment of money damages by the indemnifying party, and unless such judgment or settlement includes a release by the claimant or plaintiff of the indemnified party and its affiliates. If the indemnifying party fails to undertake a defense within thirty (30) days after notice from the indemnified party, then the indemnified party shall have the right to undertake the defense of, and, compromise or settle such liability or claim on behalf of, and for the account of, the indemnifying party.

(d)     The indemnification obligations of the parties under this Section 12 shall survive the expiration or earlier termination of the Lease Term with respect to any occurrences before the effective date of such expiration or termination.

13.    <u>Insurance</u>.

(a)     <u>Tenant's Insurance</u>:

At all times during the Lease Term, Tenant shall pay all premiums for and maintain in full force and effect the following policies of insurance with insurance companies admitted to do business in the State in which the Shopping Center is located and carrying a current rating of at least A- VI in "Best's Insurance Guide":

(i)     Commercial General Liability Insurance (1986 ISO form or its equivalent) in the amount of at least One Million and No/100 Dollars ($1,000,000.00) per occurrence, with a General Aggregate limit per location of at least Two Million and No/100 Dollars ($2,000,000.00). Tenant further agrees that such insurance shall contain fire and extended coverage legal liability insurance.

(ii)     Tenant may satisfy its obligations under this Section 13(a) by means of a so-called blanket insurance policy, provided all of the provisions and insurance coverages provided for in this Section 13(a) are complied with by such blanket insurance policy.

(iii)     The equivalent of ISO Special Form Property Insurance covering Tenant's trade fixtures, furniture, inventory and equipment used in the Demised Premises, providing protection to the extent of ninety percent (90%) of the replacement cost of such property, less a commercially reasonable deductible, not to exceed Twenty Five Thousand and No/100 Dollars ($25,000.00).

(iv)     Plate Glass Insurance covering the plate glass in the Demised Premises, which Tenant may self insure.

(v)     Statutory Workers' Compensation Insurance and Employer's Liability Insurance with minimum limits as required by law.

Each policy of insurance required by subsections 13(a)(i), (ii) and (iii) above shall name Landlord, Landlord's property manager, and any holder of a first deed of trust encumbering the Demised Premises as additional insureds. Each policy of insurance required by subsections 13(a)(i), (ii), (iii), (iv) and (v) above shall contain an endorsement requiring thirty (30) days' written notice from the insurance company to all insureds prior to any cancellation, or material reduction in coverage of the policy. Prior to the commencement of the Lease Term, and annually thereafter, Tenant shall deliver to Landlord certificates of insurance evidencing the policies of insurance required by this Section 13(a), together with satisfactory evidence of proof of payment of premiums.

(b)     <u>Landlord's Insurance</u>:

At all times during the Lease Term, Landlord shall maintain in full force and effect the following policies of insurance, with insurance companies admitted to do business in the State in which the Shopping Center is located:

(i)     Commercial General Liability Insurance (1986 ISO form or its equivalent) in the amount of at least Three Million and No/100 Dollars

($3,000,000.00) per occurrence, with a General Aggregate limit per location of at least Five Million and No/100 Dollars ($5,000,000.00).

(ii)    Umbrella Liability coverage in the amount of at least Four Million and No/100 Dollars ($4,000,000.00).

(iii)    The equivalent of ISO Special Form Property Insurance providing protection to the extent of not less than ninety percent (90%) of the replacement cost of the building in which the Demised Premises is located (less the cost of foundations and footings), including Tenant's permanent leasehold improvements. Nothing herein shall be construed to require Landlord to insure those items that Tenant is obligated to insure pursuant to Section 13(a)(iii) above. In order to assist Landlord in deciding the amount of insurance which it will obtain for Tenant's permanent leasehold improvements in the Demised Premises, Tenant shall furnish to Landlord, upon the completion of any its initial upfitting, and thereafter upon the completion of any alterations or further improvements, such evidence as Landlord may reasonably require as to the cost or value thereof. Landlord shall not be bound by such information.

(c)    Waiver of Claims; Waiver of Subrogation:

Each policy of property insurance required by this Lease shall contain an endorsement in which the insurance company waives any right of subrogation that it may acquire against Landlord or Tenant by virtue of payment of any loss under such policy. In addition, Landlord and Tenant each waives any claims it may have against the other arising out of any casualty that would be covered by the policy of property insurance required to be maintained by it under this Lease, or that actually is covered by any policy of property insurance maintained by such party, without giving effect to any deductible amounts or self insured risks.

(d)    Blanket Policies:

Any policy of insurance required by this Lease may be maintained under a blanket policy of insurance, covering multiple locations, provided that: (i) in all other respects, each such policy shall comply with the requirements of this Lease, as applicable; (ii) prior to the commencement of the Lease Term, and annually thereafter, the insuring party shall furnish the other party with a written certificate from the insurer specifying, (A) the maximum amount of the total insurance afforded by the blanket policy to the Demised Premises or the Shopping Center, as the case may be, and (B) any sublimits in the blanket policy applicable to the Demised Premises or the Shopping Center, as the case may be, which amounts shall not be less than the amounts specified in this Lease and (iii) the protection afforded the insuring party under the blanket policy shall be no less than that which would have been afforded under a separate policy or policies relating only to the Demised Premises or the Shopping Center, as the case may be.

14.    Ownership of Certain Property and Surrender of Premises.  Upon the termination of this Lease, Tenant shall surrender to Landlord the Demised Premises, including, without limitation, all buildings, permanent improvements, apparatus and fixtures (except signs, "Removable Trade Fixtures" (as hereinafter defined) and furniture, equipment, inventory and other personal property installed by Tenant) then upon the Demised Premises, "broom clean", free of debris and in good condition and repair (excepting reasonable wear and tear and damage due to fire or casualty), and all alterations, improvements, and additions which may be made or installed from time to time by either party hereto to, in, upon or about the Demised Premises; and, upon such termination, such property shall be surrendered to Landlord by Tenant without payment therefor, and Tenant shall deliver all keys to the Demised Premises to the office of Landlord at the Shopping Center or as otherwise directed by Landlord. The property to be surrendered shall include, but not be limited to, all components of the heating and air conditioning (including the portion thereof outside the Demised Premises, if any), plumbing and electrical systems, all dumbwaiters, conveyors and all non-removable partitions. Tenant shall promptly repair any damage to the Demised Premises resulting from the installation or removal of any of the foregoing items. For the purposes hereof, the phrase "Removable Trade Fixtures" means solely the following: Tenant's signs, counters, tables, chairs, desks, racks, merchandisers and displayers, standards, hang rods, shelves, marking equipment, cash registers, and other business machines.

15.    Landlord's Entry and Easement for Pipes.

(a)    Landlord's Entry.  Landlord shall have the right to enter upon the Demised Premises at all reasonable times upon at least twenty four (24) hours' prior notice, during the Lease Term for the purposes of inspection, maintenance, repair and alteration and, during the last two (2) years of the Lease Term, to show the same to prospective tenants or purchasers.

FOREVER 21, INC.

     (b)   <u>Easement for Pipes</u>.  Tenant shall permit Landlord to use, maintain and repair pipes, cables, conduits, plumbing, vents and wire in, to and through the Demised Premises to the extent that Landlord may now or hereafter deem to be necessary or appropriate for the proper operation and maintenance of the Shopping Center, provided that such work shall be performed with a minimum of disruption to Tenant and the business conducted at the Demised Premises and will be in locations which will not materially interfere with Tenant's use of the Premises (such as above Tenant's finished ceiling, below Tenant's finished floor or in immaterial parts of the non-sales areas of the Premises).

16.    <u>Default; Remedies</u>.

     (a)   Each of the following events shall constitute a "Default" by Tenant under this Lease:

        (i)   If Tenant shall fail to pay any payment of rent or other sum of money under this Lease when the same shall become due and payable and the failure shall continue for a period of ten (10) days after written notice; provided, however, such notice shall not be required more than twice in any twelve (12) month period; or,

        (ii)   If Tenant becomes bankrupt or insolvent, or files any debtor proceedings, or files in any court pursuant to any statute, either of the United States or of any State a petition in bankruptcy or insolvency or for reorganization, or files or has filed against it a petition for the appointment of a receiver or trustee for all or substantially all of the assets of Tenant and such petition is not vacated or set aside within sixty (60) days from the date of such appointment; or,

        (iii)   If Tenant makes an assignment for the benefit of creditors, or petitions for or enters into an arrangement; or,

        (iv)   If Tenant vacates or abandons the Demised Premises or any substantial part thereof or suffers the Lease to be taken upon any writ of execution and such writ is not vacated or set aside within fifteen (15) days; or,

        (v)   If Tenant shall transfer Tenant's interest in this Lease in contravention of Section 21 hereof; or,

        (vi)   If Tenant shall fail to perform or observe any of the terms, conditions, or covenants contained in this Lease other than above specified and the failure shall continue for thirty (30) days after notice; but Tenant shall have such additional time as is reasonably necessary for the curing of any default that reasonably requires with the exercise of due diligence more than thirty (30) days for the curing thereof provided Tenant commences to cure such default within the aforementioned thirty (30) day period and thereafter continuously and diligently pursues and completes such act or acts; or,

        (vii)   the rejection by Tenant, its bankruptcy trustee, or any entity authorized by court order to act on behalf of Tenant, of this Lease under 11 U.S.C. sec. 365(a) or any other provision of title 11 of the United States Code, or the deemed rejection of this Lease by operation of law under 11 U.S.C. sec. 365(d)(4).  Any such rejection of this Lease terminates this Lease, without notice of any kind to Tenant, effective on the later of: (1) the date Tenant vacates the Demised Premises following such rejection; (2) the date the Bankruptcy Court with jurisdiction over Tenant's bankruptcy case enters an order on its docket authorizing Tenant to reject this Lease; or (3) the date this Lease is deemed rejected under 11 U.S.C. sec. 365(d)(4).

     (b)   Upon each occurrence of any Default, Landlord shall have the option to pursue, any one or more of the following remedies and/or any other remedies to which Landlord is entitled at law or in equity:

        (i)   Terminate this Lease, in which event Tenant shall immediately surrender the Demised Premises to Landlord.  If Tenant fails to do so, Landlord may, without any further notice and without prejudice to any other remedy Landlord may have for possession or arrearages in rental, enter upon and take possession of the Demised Premises and remove Tenant and its effects without being liable for prosecution or any claim for damages therefor.

FOREVER 21, INC.

(ii)    If the Event of Default relates to nonpayment of Guaranteed Minimum Rent or any other monetary sum due hereunder, or the desertion, vacation or abandonment of the Demised Premises, terminate this Lease, in which event Tenant's default shall be deemed a total and entire breach of Tenant's obligations under this Lease and Tenant immediately shall become liable for damages in an amount equal to the excess of (A) the total rental for the remainder of the Lease Term, discounted at the Prime Rate (hereinafter defined) to the then present value, together with all other reasonable expenses incurred by Landlord in connection with Tenant's default, all sums due pursuant to Section 16(c) below, and the unpaid rental due as of the date of termination, over (B) the fair market rental value of the Demised Premises for the balance of the Lease Term, discounted at the Prime Rate to the then present value.  For the purposes of clause (B) above, the components of monthly rent  for the remainder of the Lease Term shall be deemed to be equal to the respective monthly amounts thereof as were due and payable during the month in which the Lease was terminated.  It is acknowledged, intended and agreed that the amounts which Landlord is entitled to recover under this Section 16(b) constitute liquidated damages and not a penalty for Tenant's defaults related to nonpayment of rental, or the desertion, vacation or abandonment of the Demised Premises.  Such amounts constitute the parties' best, good faith, and reasonable estimate of the damages which would be suffered by Landlord in the event any such default occurs, the exact amount of such damages being difficult or impractical to calculate.

(iii)    Enter upon and take possession of the Demised Premises as Tenant's agent without terminating this Lease and without being liable for prosecution or any claim for damages therefor, and Landlord may relet the Demised Premises as Tenant's agent and receive the rental therefor, in which event Tenant shall pay to Landlord on demand all sums due pursuant to Section 16(c) below, together with any deficiency that may arise by reason of such reletting.

(iv)    Do whatever Tenant is obligated to do under this Lease and enter the Demised Premises, without being liable for prosecution or any claim for damages therefor, to accomplish such purpose.  Tenant shall reimburse Landlord immediately upon demand for any expenses which Landlord incurs in thus effecting compliance with this Lease on Tenant's behalf, together with interest thereon at the highest non-usurious lawful rate from the date Landlord incurs the expense in question until Landlord is reimbursed therefor.

(v)    Without notice, alter the locks and any other security device or devices which allow Tenant access to the Demised Premises or the building of which the Demised Premises form a part, and Landlord shall not be required to provide a new key or right of access to Tenant, and restrict or terminate any right to use parking facilities associated with the Shopping Center as well as utility services to the Demised Premises.

(c)    Upon the occurrence of any Default, in addition to any other sum provided to be paid herein, Tenant also shall be liable for and shall pay to Landlord: (i) reasonable brokers' fees incurred and paid by Landlord in connection with reletting the whole or any part of the Demised Premises; (ii) the costs of removing and storing Tenant's property; (iii) the costs of repairing, altering, remodeling or otherwise putting the Demised Premises into condition acceptable to a new tenant or tenants; (iv) all reasonable expenses incurred in marketing the Demised Premises and (v) all reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies.  If either party hereto institutes any action or proceeding to enforce any provision hereof by reason of any alleged breach of any provision of this Lease, the prevailing party shall be entitled to receive from the losing party all reasonable attorneys' fees and all court costs in connection with such proceeding.  In no event shall either party ever be liable to the other for any indirect or consequential damages by reason of a party's breach or default of the terms of this Lease.

(d)    The term "Prime Rate" as used herein shall mean the per annum "prime rate" of interest as published, on the date on which this Lease is terminated in accordance with this Section 16, by The Wall Street Journal in its listing of "Money Rates," or if The Wall Street Journal is not published on the date on which this Lease is terminated, then the "prime rate" of interest as published in The Wall Street Journal on the most recent date prior to the date on which this Lease is so terminated.

FOREVER 21, INC.

(e)     If Landlord fails to perform any of its obligations hereunder within thirty (30) days after written notice from Tenant specifying in detail such failure (or if the failure cannot be corrected, through the exercise of reasonable diligence, within such 30 day period, if Landlord does not commence to correct same within such 30 day period and thereafter diligently prosecute same to completion), Tenant, in addition to any remedy or right available to it under law or in equity, shall have the right  to an action for declaratory relief or actual monetary damages, excluding lost profits and lost economic damages.  Unless and until Landlord fails to so cure any default after such notice, Tenant shall not have any remedy or cause of action by reason thereof.  Notwithstanding any other provision hereof, Landlord shall not have any personal liability hereunder.  In the event of any breach or default by Landlord of any term or provision of this Lease, Tenant agrees to look solely to the equity or interest of Landlord in the Shopping Center, including the Demised Premises and the building of which the Demised Premises are a part.

(f)     If Landlord repossesses the Demised Premises pursuant to the authority herein granted, then Landlord shall have the right to (i) keep in place and use or (ii) remove and store, all of the furniture, fixtures and equipment at the Demised Premises, including that which is owned by or leased to Tenant at all times prior to any foreclosure thereon by Landlord or repossession thereof by any landlord thereof or third party having a lien thereon.  Landlord also shall have the right to relinquish possession of all or any portion of such furniture, fixtures, equipment and other property to any person ("Claimant") who presents to Landlord a copy of any instrument represented by Claimant to have been executed by Tenant (or any predecessor of Tenant) granting Claimant the right under various circumstances to take possession of such furniture, fixtures, equipment or other property, without the necessity on the part of Landlord to inquire into the authenticity or legality of said instrument.  The rights of Landlord herein stated shall be in addition to any and all other rights that Landlord has or may hereafter have at law or in equity; and Tenant stipulates and agrees that the rights herein granted Landlord are commercially reasonable.

(g)     Notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated as rent, shall constitute rent.

(h)     This is a contract under which applicable law excuses Landlord from accepting performance from (or rendering performance to) any person or entity other than Tenant.

17.    Remedies Cumulative - Nonwaiver.  Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Demised Premises by Landlord, whether by agreement or by operation of law, it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant.  No remedy herein or otherwise conferred upon or reserved to Landlord or Tenant shall be considered exclusive of any other remedy, but the same shall be distinct, separate and cumulative and shall be in addition to every other remedy given under this Lease, or now or hereafter existing at law or in equity or by statute; and every power and remedy given by this Lease to Landlord or Tenant may be exercised from time to time as often as occasion may arise, or as may be deemed expedient.  No delay, omission or forbearance by Landlord to exercise any right or power under this Lease, at law or in equity shall impair any such right or power or be construed as a waiver of any Default or an acquiescence thereto.  In particular, the receipt by Landlord of rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach and no provision of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing and signed by Landlord.

18.    Damage and Destruction and Eminent Domain.

(a)     Damage and Destruction. (i) Unless this Lease is terminated as provided in Section 18(a)(iii) below after any damage or destruction to the Demised Premises, Landlord shall repair and restore those parts of the Demised Premises constructed by it to substantially the same condition as existed immediately prior to the damage.  Tenant shall likewise repair and restore all other parts of the Demised Premises (not required to be repaired or restored by Landlord) to substantially the condition as existed immediately prior to the damage, including all leasehold improvements, exterior signs, trade fixtures, equipment, display cases, furniture, furnishings and other installations of Tenant.  If the Demised Premises are damaged or destroyed, but this Lease is not terminated pursuant to Section 18(a)(iii) below, then upon the expiration of the applicable ninety (90) day period provided for in Section 18(a)(iii) below, or upon notice by Landlord to Tenant prior thereto (but after the expiration of the thirty (30) day period, if applicable) that Landlord has elected not to terminate this Lease, Landlord and Tenant shall commence their respective obligations under this Section 18(a)(i) as soon as is reasonably possible, and shall prosecute the same to completion with all due diligence.

FOREVER 21, INC.

(ii) All property insurance proceeds payable with respect to the Demised Premises, excluding the proceeds payable to Tenant under the separate policy of property insurance maintained by it under Section 13(a)(iii), shall belong to and shall be payable to Landlord. If this Lease is not terminated as provided in Section 18(a)(iii) below, Landlord shall disburse and apply such property insurance proceeds as follows: first, to be applied against the cost to Landlord of Landlord's restoration and rebuilding obligations; second, to be paid to Tenant to the extent of the cost of Tenant's construction and restoration obligations (but excluding furniture, furnishings, movable trade fixtures and other repairs covered by the separate policy of property insurance maintained by Tenant); subject, however, to the limitation set forth in Section 13(b)(iii); and third, the balance of any insurance recovery shall belong to and be the exclusive property of Landlord.

(iii) If the Demised Premises or any or all of the buildings of the Shopping Center are damaged or destroyed by any casualty not covered by the policy of insurance maintained by Landlord under Section 13(b)(iii), or if the casualty is so covered, but (1) the insurance proceeds (including any applicable deductible amount) are insufficient or unavailable to cover Landlord's restoration obligations, or (2) Landlord's architect certifies that the extent of such damage or destruction is fifty percent (50%) or more of the replacement value of the the Shopping Center, as the case may be, immediately prior to the occurrence of such damage or destruction, then Landlord shall have the option to terminate this Lease by giving Tenant notice in writing any time within ninety (90) days after the occurrence of such casualty. If (i) the Demised Premises are damaged or destroyed during the last two (2) Lease Years of the Lease Term by any casualty or (ii) Landlord's architect certifies that the extent of such damage or destruction is thirty five percent (35%) or more of the replacement value of the Demised Premises immediately prior to the occurrence of such damage or destruction, or (iii) Landlord fails to commence restoration of the Premises or the Shopping Center within one hundred eighty (180) days after Landlord receives the insurance proceeds in an amount sufficient to restore the damage, or fails to complete within three hundred sixty (360) days following the date the Premises or the Shopping Center are rendered untenantable for their accustomed use by fire or other casualty, Tenant shall have the option to terminate the Lease by giving Landlord notice in writing any time within thirty (30) days after the occurrence of such casualty. In the event of any termination under this Section 18(a)(iii), this Lease shall terminate at the end of the calendar month in which the notice of termination is given, and Landlord shall refund to Tenant any rent or other charges previously paid by Tenant and pertaining to the period after the date of the casualty. Landlord shall not terminate this Lease pursuant to Section 18 unless Landlord terminates the leases of all other tenants who are similarly affected and as to which Landlord has the right to so terminate.

(iv) If the Demised Premises are damaged, the Guaranteed Minimum Rent, additional rent and all other charges payable under this Lease shall be abated in proportion to the degree in which Tenant's use of the Demised Premises is impaired during the period of any damage, repair or restoration provided for in this Section 18. Tenant shall continue to operate its business in the Demised Premises during any such period, to the extent reasonably practicable from the standpoint of reasonable business management. Except for the abatement of the Guaranteed Minimum Rent and other charges provided for above, Tenant shall not be entitled to any compensation or damage from Landlord for loss of the use of the whole or any part of the Demised Premises, or for inconvenience or annoyance occasioned by any damage, destruction, repair or restoration.

(b) <u>Eminent Domain</u>. If any substantial part of the Demised Premises or more than thirty percent (30%) of the total Shopping Center is taken under the power of eminent domain (including any conveyance made in lieu thereof), and such taking makes the operation of Tenant's business on the Demised Premises impractical, then Tenant shall have the right to terminate this Lease by giving Landlord written notice of such termination within thirty (30) days after such taking; and if Tenant does not so elect to terminate this Lease, Landlord apply the proceeds of such condemnation to repair and restore the Demised Premises to tenantable condition, in which case the rental to be paid by Tenant hereunder shall be proportionately and equitably reduced.

FOREVER 21, INC.

All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) whether for the whole or a part of the Demised Premises, shall be the property of Landlord, whether such award is compensation for damages to Landlord's or Tenant's interest in the Demised Premises, and Tenant hereby assigns all of its interest in any such award to Landlord; provided, however, Landlord shall have no interest in any award made to Tenant for relocation expenses, such business loss as Tenant shall specifically and separately establish, for the taking of Tenant's leasehold improvements and trade fixtures, and other property within the Demised Premises (which Tenant is authorized to remove at termination pursuant to Section 14), if a separate award of such items is made to Tenant, but any such award to Tenant shall be subject to the prior rights of the first mortgagee.

20.     Financial Information; Statement of Tenant; Amendment of Lease.

(a)     During the Lease Term, in connection with any financing or sale of the Shopping Center whereby the potential lender or purchaser has requested such information, Tenant shall, within thirty (30) days of written request by Landlord, deliver to Landlord any and all of the following:

(i)     Such financial information concerning Tenant and Tenant's business operations (and the Guarantor of this Lease) as may be reasonably requested by any mortgagee or prospective mortgagee or purchaser of the Shopping Center.

(ii)     An executed and acknowledged instrument amending this Lease in such respects as may be required by any holder or prospective holder of a mortgage or deed of trust on the Demised Premises, provided that any such amendment shall not affect the Lease Term or the rent or other charges to be paid by Tenant under this Lease, increase any of Tenant's obligations or decrease any of Tenant's rights under this Lease.

(b)     Any financial information delivered pursuant to Section 20(a)(i) and any amendment delivered pursuant to Section 20(a)(ii) may be relied upon by any mortgagee, prospective mortgagee or prospective purchaser of the Shopping Center; provided, however, that any such financial information and any such amendment shall be utilized only for bona fide business reasons related to such mortgage, purchase and/or obtaining thereof, except where the contrary is required by law.

21.     Assignment, Subletting and Hypothecation of Lease.

(a)     As used in this Section 21, the following definitions shall apply:

(i)     "Transfer" means any voluntary, unconditional and present (i) assignment of Tenant's entire interest, rights and duties in this Lease and the Demised Premises, including Tenant's right to use, occupy and possess the Demised Premises, or (ii) sublease of Tenant's right to use, occupy and possess the Demised Premises, in whole or in part;

(ii)     "Encumbrance" means any conditional or contingent assignment voluntarily made by Tenant of some or all of Tenant's interest, rights or duties in this Lease or the Demised Premises relating to any mortgage, pledge, hypothecation, lien, or other security arrangement;

(iii)     "Change of Control" means the transfer by sale, assignment, death or incompetency, mortgage, trust, operation of law, or otherwise of any shares, voting rights or ownership interests which will result in a change in the identity of the person or persons exercising, or who may exercise, effective control of Tenant, unless such change results from the trading of shares listed on a recognized public stock exchange and such trading is not for the purpose of acquiring effective control of Tenant. If Tenant is a private corporation whose stock becomes publicly held, the transfers of such stock from private to public ownership shall not be deemed a Change of Control;

(iv)     "Occupancy Transaction" means any Transfer, Encumbrance, Change of Control, or other arrangement, other than a Permitted Assignment, whereby the identity of the person or persons using, occupying or possessing the Demised Premises changes or may change, whether such change be of an immediate, deferred, conditional, exclusive, nonexclusive, permanent or temporary nature;

FOREVER 21, INC.

(v)     "Transferee" means the proposed assignee, sublessee, mortgagee, pledgee or other recipient of Tenant's interest, rights or duties, in this Lease or the Demised Premises in an Occupancy Transaction.

(vi)    "Permitted Assignment" means an assignment of this Lease to, or merger with Tenant's parent corporation in the event Tenant is a corporation and a subsidiary of another corporation. Any other merger, or any dissolution, consolidation or other reorganization of Tenant or the sale or other transfer (except as the result of death) of more than fifty percent (50%) of the corporate stock of Tenant or fifty percent (50%) of its voting stock shall constitute an assignment of this Lease for all purposes of this Section 21 and is prohibited without the written consent of Landlord.

In no event shall Tenant be permitted to use a series of one or more Permitted Assignments to "spin off" this Lease to independent third parties.  As an example of the foregoing, Tenant shall not assign this Lease to an affiliate corporation whose assets consist solely of this Lease and the rights granted herein and thereafter immediately sell the stock of such affiliate corporation to an independent third party.  The result of what would otherwise be two (2) independent Permitted Assignments would become a transfer of this Lease to an independent third party.  Any such transfer must meet all the requirements of this Section 21.

(b)     (i)     Tenant shall not make or consent to any Encumbrance without the prior written consent of Landlord, which Landlord may grant or withhold in its sole and absolute discretion.

(ii)    Tenant shall not enter into, or consent to, an Occupancy Transaction, other than an Encumbrance, without first procuring Landlord's written consent, which Landlord shall not withhold unreasonably; provided, however, that by way of example and without limitation, the parties agree it shall be reasonable for Landlord to withhold its consent if any of the following situations exist or may exist:

(A)     The Transferee's use of the Demised Premises following the Occupancy Transaction would be different from the Permitted Use set forth in this Lease; or

(B)     In Landlord's reasonable business judgment, the Transferee lacks sufficient business reputation or experience to operate a successful business of the type and quality permitted under this Lease; or

(C)     the present net worth of the Transferee is less than Forty Million Dollars ($40,0000,000); or

(D)     intentionally omitted; or

(E)     The Occupancy Transaction would breach any covenant of Landlord respecting radius, location, use or exclusive in any other lease, financing agreement, or other agreement relating to the Shopping Center.

(c)     Tenant shall not have the right or power to request or enter into an Occupancy Transaction if Tenant shall be in default under any provision of this Lease beyond applicable notice and cure periods.

(d)     Should Tenant desire to enter into an Occupancy Transaction, Tenant shall request in writing Landlord's consent to such transaction at least forty five (45) days before the "Effective Date" of any such transaction, providing the following:

(i)     The full particulars of the proposed transaction, including its nature, effective date, terms and conditions, and copies of the negotiated assignment agreements or subleases;

(ii)    A description of the identity, net worth and previous business experience of the Transferee, including, without limitation, copies of Transferee's latest income, balance sheet and change of financial position statements (with accompanying notes and disclosures of all material changes thereto) in audited form, if available, and certified as accurate by the Transferee;

FOREVER 21, INC.

(iii)    Any further information commerically reasonably relevant to the transaction which Landlord shall have requested within fifteen (15) days after receipt of Tenant's request for consent; and

(iv)    A statement that Tenant intends to consummate the transaction if Landlord consents thereto.

Within thirty (30) days after receipt of Tenant's request for consent, Landlord may respond as follows:

(A)    Consent to the Occupancy Transaction; or

(B)    Reasonably refuse to consent to the Occupancy Transaction.

(e)    Each Occupancy Transaction to which Landlord has consented shall be evidenced by an instrument made in such written form as is reasonably satisfactory to Landlord and executed by Tenant and Transferee. By such instrument, Transferee shall assume and promise to perform the terms, covenants and conditions of this Lease which are obligations of Tenant                                 Unless                   expressly                  released                  by Landlord, in writing, Tenant shall remain fully liable to perform its duties under this Lease following the Occupancy Transaction. Tenant shall, on demand of Landlord, reimburse Landlord for Landlord's reasonable costs, including attorney fees, incurred in obtaining advice and preparing documentation for each Occupancy Transaction, in the amount of Five Hundred and 00/100 Dollars ($500.00).

(f)    In the event Tenant assigns this Lease, or sublets all or substantially all of the Demised Premises, and the rent and other amounts payable by the assignee or sublessee exceed the rent and other amounts payable by Tenant under this Lease, then fifty percent (50%) of such excess shall be paid to Landlord monthly in arrears, on or before the first (1st) day of each calendar month, as additional rent.

(g)    Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right, without the consent of Landlord, to assign this Lease or sublet all of the Premises to a corporation or other entity which:

(i)    Is Tenant's parent corporation; or

(ii)    Is a wholly-owned subsidiary of Tenant; or

(iii)    Is a corporation of which Tenant or Tenant's parent corporation owns or the shareholders of Tenant or Tenant's parent corporation own more than fifty percent (50%) of the outstanding capital stock; or

(iv)    as a result of a consolidation, merger or other reorganization with Tenant and/or Tenant's parent corporation, shall own all or substantially all of the capital stock or assets of Tenant or Tenant's parent corporation; or

(v)    acquires or is acquiring all or substantially all of the outstanding capital stock of Tenant or all or substantially all of the assets of Tenant; or

(vi)    acquires or is acquiring all or substantially all of the enclosed mall stores of Tenant operating under the same trade name as is then in use at the Premises; or

(vii)    as a result of a change of the domicile of Tenant or the reincorporation of Tenant in another jurisdiction shall own all or substantially all of the assets of Tenant.

Any assignment or subletting pursuant to (i)-(vii) above, inclusive, may only be subject to the following conditions: (a) Tenant shall remain fully liable for all of the Lease's terms, covenants and conditions during the unexpired term of this Lease, and (b) any such assignment or subletting shall be subject to all of the terms, covenants and conditions of this Lease. In addition, any assignment or subletting pursuant to (iv), (v), (vi) or (vii) above will be subject to the condition that the assignee or subtenant shall have a net worth equal to, or greater than Forty Million and 00/100 Dollars ($40,000,000.00). Notwithstanding anything contained in this Section 17.01(e), Landlord acknowledges that Tenant may not exist after an event set forth above as (iv) and (vi) and that in such case, Tenant shall not remain fully liable for the terms, covenants and conditions of this Lease as an operation of law,

FOREVER 21, INC.

however, the surviving, new or remaining entity resulting from (iv) and (vi) above shall be liable for such terms, covenants and conditions.

22.    Promotion of the Shopping Center.

(a)    Landlord may, in Landlord's sole discretion, establish a Promotion/Marketing Fund ("Promotion Fund") and secure therewith professional advertising and sales promotional services and activities for the benefit of the Shopping Center. In connection with the Promotion Fund, Landlord agrees to secure, in Landlord's sole discretion, promotion and secretarial services and, using funds from the Promotion Fund, (i) to pay the salaries and expenses for all personnel and (ii) to pay for the rental, utilities, telephone and space used for securing the services of such Promotion Fund. Tenant agrees to pay Landlord an amount as specified in Section 1(j)(i) as a Promotion Fund contribution. Any partial calendar year shall be prorated on a three hundred sixty five (365) day basis. Tenant agrees that at the end of every calendar year during the Lease Term both the per square foot Promotion Fund fee and minimum annual fee described in Section 1(j)(i) shall be increased over the fees payable in such calendar year in proportion to the increase in the cost of living (determined as provided below) between the beginning date of such calendar year and the ending date of such calendar year. Such increased fees shall be payable during the next calendar year and shall be the base amounts used to calculate the next increase in such fees. The base date applicable to calculating the increase at the end of the first calendar year shall be January 1 of the year in which the Rent Commencement Date occurs. The base date for each subsequent calendar year after the first calendar year shall be January 1 of such year.

The cost of living on each such date shall be measured by the Consumer Price Index For All Urban Consumers specified for all items, U.S. City Average (1982 84 = 100) published on the date nearest to each such date by the Bureau of Labor Statistics of the United States Department of Labor; or, if such index is not then in use, by the index most nearly comparable thereto, as selected by Landlord.

(b)    Landlord may, in Landlord's sole discretion, establish a Media/Marketing Fund ("Media Fund") for the benefit of the Shopping Center or the Integrated Shopping Center. Tenant agrees to pay Landlord an amount as specified in Section 1(j)(ii) as a Media Fund contribution. Any partial calendar year shall be prorated on a three hundred sixty five (365) day basis. Tenant agrees that at the end of every calendar year during the Lease Term both the per square foot Media Fund fee and minimum annual fee described in Section 1(j)(ii) shall be increased over the fee payable in such calendar year in proportion to the greater of: (i) the increase in the cost of living {determined as provided in Section 22(a) above} between the beginning date of such calendar year and the ending date of such calendar year, or (ii) the increase in the "cost of media" (determined as provided below) between the beginning date of such calendar year and the ending date of such calendar year. Such increased fees shall be payable during the next calendar year and shall be the base amounts used to calculate the next increase in such fees. The base date applicable to calculating the increase at the end of the first calendar year shall be January 1 of the year in which the Rent Commencement Date occurs. The base date for each subsequent calendar year after the first calendar year shall be January 1 of such year.

The increase in the "cost of media" shall be equal to the average increase in the cost of the following three (3) items:  (i) a twenty one (21) inch advertisement in the largest daily newspaper located in Baldwin or Mobile County, Alabama, (ii) a thirty (30) second advertisement adjacent to or in the highest rated prime time show on the television station which has the largest combined prime time rating in the county in which the Shopping Center is located, all as determined by the rating service commonly accepted by advertising agencies in that city, and (iii) a sixty (60) second advertisement in morning drive time on the highest rated radio station in county where the Shopping Center is located ADI, according to the most recently available Arbitron study, ranked by total adults, ages twenty five (25) to fifty four (54).

(c)    The payments required to be made pursuant to this Section 22 shall be paid by Tenant in monthly installments in advance on the first day of each month and shall be treated as additional rent.

(d)    Notwithstanding anything to the contrary contained in this Section 22 or elsewhere in this Lease, Tenant shall not be obligated to make any payments under this Section 22, as the parties hereto agree that such payments are included in Guaranteed Minimum Rent.

23.    Notices.  All notices provided for in this Lease shall be in writing and shall be deemed to be completed upon actual receipt as indicated on the signed return receipt when sent by prepaid registered or certified mail, return receipt requested, or by a national, independent courier (such as "Federal Express") addressed to the parties at the notice addresses set out in Section 1(m) for Tenant and Section

FOREVER 21, INC.

1(l) for Landlord.  Either party may, from time to time, by ten (10) days prior written notice given as provided above, designate a different address to which notices to it shall be sent.

24.    Holding Over.  If Tenant remains in possession of the Demised Premises or any part thereof after the expiration of the Lease Term with Landlord's acquiescence and without any written agreement of the parties, Tenant shall be only a tenant at will at a rent equal to one hundred fifty percent (150%) of the Guaranteed Minimum Rent in effect immediately prior to the expiration of the Lease Term, together with other charges set forth in this Lease, and there shall be no renewal of this Lease or exercise of an option by operation of law.

25.    Subordination.  This Lease is subject and subordinate to any first mortgage or first deed of trust now or hereafter placed on the property of which the Demised Premises is a part; provided, however, that at the option of the first mortgagee this Lease or portions of this Lease can be made superior to the first mortgage or deed of trust; and provided further that unless the entire Lease is made superior to such first mortgage or deed of trust, the holder of the mortgage or the trustee of the deed of trust shall agree in writing that the rights of Tenant under this Lease shall not be divested or in any way affected by a foreclosure or other default proceeding under the mortgage, deed of trust or obligations secured thereby, so long as Tenant is not in Default under the terms of this Lease; and Tenant agrees that this Lease shall remain in full force and effect notwithstanding any such default proceeding under the mortgage, deed of trust or obligations secured thereby.  Tenant further agrees that it will attorn to the mortgagee, trustee or beneficiary under such mortgage or deed of trust, to their successors or assigns and to any purchaser or its assignee at a foreclosure sale.  Tenant will, within thirty (30) days of written request by Landlord, execute and deliver to Landlord, or to any other person designated by Landlord, any commercially reasonable instrument or instruments reasonably required to give effect to the provisions of this Section 25.

26.    Transfer of Landlord's Interest.  In the event of the sale, assignment or transfer by Landlord of its interest in the Shopping Center or in this Lease (other than a collateral assignment to secure a debt of Landlord) to a successor in interest who expressly assumes the obligations of Landlord under this Lease, Landlord shall thereupon be released or discharged from all of its covenants and obligations under this Lease, except such obligations as shall have accrued prior to any such sale, assignment or transfer; and Tenant agrees to look solely to such successor in interest of Landlord for performance of such obligations.  Any securities given by Tenant to Landlord to secure the performance of Tenant's obligations under this Lease may be assigned by Landlord to such successor in interest of Landlord; and, upon acknowledgement by such successor of receipt of such security and its express assumption of the obligations to account to Tenant for such security in accordance with the terms of this Lease, Landlord shall thereby be discharged of any further obligation relating thereto.  Landlord's assignment of this Lease or of any or all of its rights herein shall in no manner affect Tenant's obligations hereunder.  Tenant shall thereafter attorn and look to such assignee as Landlord, provided Tenant has first received written notice of such assignment of Landlord's interest.

27.    Warranty.  Landlord warrants that it has full right and authority to lease the Demised Premises upon the terms and conditions set forth in this Lease; and that Tenant shall peacefully and quietly hold and enjoy the Demised Premises for the full Lease Term so long as it is not in default in the performance of any of its covenants beyond applicable notice and cure periods.

28.    Commencement Agreement.  Within twenty (20) days of the Rent Commencement Date and after written request from Landlord, Tenant shall execute and return to Landlord a commencement agreement in the form attached hereto as Exhibit C, specifying the Term Commencement Date and Term Expiration Date of the Lease Term and any other provisions hereof (exclusive of provisions dealing with monetary terms) as Landlord may reasonable require to incorporate herein.

29.    Estoppel Certificate.  Within twenty (20) days after request therefor by Landlord or any proposed mortgagee or trustee under a mortgage or deed of trust covering the Demised Premises or any proposed lender whose loan will be secured by a pledge of any stock, membership, partnership or other interests in Landlord, or if, upon any sale, assignment or other transfer of the Demised Premises by Landlord, an estoppel certificate shall be required from Tenant, Tenant shall deliver in recordable form an estoppel certificate in the form attached hereto as Exhibit E or in such other form as may be reasonably required by any proposed mortgagee, trustee, lender or other transferee, certifying to Landlord and to said mortgagee, trustee, lender and/or other transferee those facts contained therein that are then true with respect to this Lease and specifying with particularity any of such facts which are not then true with respect to this Lease.

30.    Mechanics' Liens.  Tenant covenants and agrees to do all things necessary to prevent the filing of any mechanics' or other liens against Tenant's interest in this Lease or in the Demised Premises by reason of work, labor, services or materials supplied or claimed to have been supplied to Tenant, or anyone holding the Demised Premises, or any part thereof, through or under Tenant.  If any such lien shall at any time be filed against Tenant's interest in the Demised Premises, Tenant shall either cause the same to be discharged of record within twenty (20) days after the date of filing of the same, or, if Tenant,

FOREVER 21, INC.

in Tenant's sole discretion and in good faith, determines that such lien should be contested, shall furnish such security as may be necessary or required to prevent any foreclosure proceedings against Tenant's interest in the Demised Premises during the pendency of such contest.  If Tenant shall fail to discharge such lien within such period or fails to furnish such security, then, in addition to any other right or remedy of Landlord resulting from Tenant's default, Landlord may, but shall not be obligated to, discharge the lien either by paying the amount claimed to be due or by procuring the discharge of such lien by giving security or in such other manner as may be prescribed by law and Tenant shall, within twenty (20) days after written demand by Landlord, reimburse Landlord for all of its reasonable costs and expenses arising in connection with such liens (including reasonable attorneys' fees).  Nothing contained in this Section 30 shall imply any consent or agreement on the part of Landlord to subject Landlord's estate to liability under any mechanics' or other lien law.

31.    Force Majeure.  In the event Landlord or Tenant shall be delayed, hindered or prevented from the performance of any act required hereunder, by reason of governmental restrictions, scarcity of labor or materials, strikes, fire, or any other reasons beyond its control, the performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for the period necessary to complete performance after the end of the period of such delay. Notwithstanding the preceding sentence, the provisions of this Section 31 shall not be applicable to Tenant's obligations to pay rent or any other sums, monies, costs, charges or expenses required to be paid by Tenant subsequent to the Rent Commencement Date.  As a condition to either party's right to avail itself of force majeure, such party must give the other written notice of such claimed force majeure not later than three (3) business days following the occurrence of such force majeure.

32.    Limitation of Liability.  Notwithstanding anything contained in this Lease to the contrary, Tenant agrees that it shall look solely to the estate, interest and property of the Landlord in the Shopping Center for the collection of any judgment (or other judicial process) requiring the payment of money by Landlord for any default or breach by Landlord of any of its obligations under this Lease, subject, however, to the prior rights of any ground or underlying landlord or the holder of any mortgage covering the Shopping Center or of Landlord's interest therein.  No other assets of Landlord shall be subject to levy, execution or other judicial process for the satisfaction of Tenant's claim.

33.    Real Estate Brokers.  Tenant represents that Tenant has not dealt with any real estate broker, salesperson or finder in connection with this Lease. Tenant agrees to indemnify and hold harmless Landlord from and against any and all liabilities and claims for commissions and fees arising out of a breach of the foregoing representation.

34.    Accord and Satisfaction.  No payment by Tenant or receipt by Landlord of a lesser amount than any installment or payment of rent or other charges due under this Lease shall be deemed to be other than on account of the amount due, and no endorsement or statement on any check or any letter accompanying any check or payment of rent or other charges shall be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such installment or payment of rent or other charge or pursue any other remedies available to Landlord.  No receipt of money by Landlord from Tenant after the termination of this Lease or Tenant's right of possession of the Demised Premises shall reinstate, continue or extend the Lease Term.

35.    Nature and Extent of Agreement.  This Lease sets forth the sole and entire agreement between the parties hereto and their respective representatives and agents.  No present or past dealings or custom between the parties shall be permitted to contradict or modify the terms hereof.  There are no oral or written agreements or representations between the parties affecting this Lease, and this Lease supersedes, cancels and negates any and all previous negotiations, arrangements, representations, brochures, displays, projections, materials, discussions, estimates, agreements and understandings, if any, made by or between Landlord and Tenant with respect to the subject matter hereof, and none of the foregoing shall be used to interpret, construe, supplement or contradict this Lease.  Without limiting the foregoing, neither Landlord nor any agent or representative of Landlord, including any leasing agent acting on behalf of Landlord, has made, and Tenant has not relied on, any representations or assurances as to Tenant's projected or likely sales volume, customer traffic or profitability.  Tenant also acknowledges that, to the extent any brochures, displays, projections, materials, discussions, or estimates relate or have related to Tenant's projected or like sales volume, customer traffic or profitability, Tenant understands and agrees that any and all such brochures, displays, projections, materials, discussions, or estimates are based solely on Landlord's experiences at other properties and/or upon standardized marketing studies, and that such brochures, displays, projections, materials, discussions, or estimates shall not be construed, or relied upon by Tenant, as a promise, warranty or guarantee that Tenant will realize the same, similar or any other results.  Except for the express representations, covenants and warranties specifically contained in this Lease, if any, there are no representations, covenants or warranties between the parties and all reliance by Tenant shall be based solely upon the express representations, covenants and warranties specifically contained in this Lease, if any, and, therefore, Tenant hereby waives to the full extent not prohibited by law any and all claims against, or liability of, Landlord and Landlord's employees, agents, and contractors based upon reliance upon any and all representations, covenants or warranties not

FOREVER 21, INC.

specifically contained herein. Unless otherwise expressly set forth in writing herein, Tenant acknowledges that there are no agreements, promises, representations, warranties or covenants by Landlord or its agents or employees as to the following types of matters, including, without limitation: (i) exclusive rights to sell goods and/or services; (ii) limitations on or restrictions against competing businesses in the Shopping Center; (iii) the future opening of other stores or businesses not currently in the Shopping Center; (iv) expected per square foot or total sales from the Demised Premises; (v) type or quality of existing or prospective tenants located or to be located in the Shopping Center; (vi) intentionally omitted; (vii) intentionally omitted ; (viii) intentionally omitted; or (ix) intentionally omitted. Although the printed provisions of this Lease were drawn by Landlord, the parties hereto agree that this circumstance alone shall not create any presumption, canon of construction or implication favoring the position of either Landlord or Tenant. The parties agree that any deletion of language from this Lease prior to its mutual execution by Landlord and Tenant shall not be construed to have any particular meaning or to raise any presumption, canon of construction or implication, including any implication that the parties intended thereby to state the converse, obverse or opposite of the deleted language. The laws of the State in which the Shopping Center is located shall govern the validity, interpretation, performance and enforcement of this Lease.

36.     Binding Effect. This Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns.

37.     Venue. Tenant agrees that any action brought in connection with this Lease shall be maintained in any court of competent jurisdiction in the County and State in which the Shopping Center is located.

38.     Jury Trial. The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either party and related to this Lease.

39.     Right of Redemption. To the extent legally permissible, Tenant hereby waives, for itself and all persons claiming by, through or under Tenant, any right of redemption or for the restoration of the operation of this Lease under any present or future law in the event Landlord shall obtain possession of the Demised Premises.

40.     Execution of Documents. In the event Tenant shall request a subordination of any rights of Landlord, or of the rights of any mortgagee or ground lessor, in addition to having the independent discretion to approve or reject any such request, Landlord shall have the further right to condition approval upon Tenant's paying a fee, in advance, in the minimum amount of Five Hundred and No/100 Dollars ($500.00) to reimburse Landlord for Landlord's administrative expense in handling such request and obtaining legal review of all documents submitted.

41.     Interpretation. The printed provisions of this Lease and any additions written or typed hereon and all attachments hereto shall be given equal weight. The printed provisions of this Lease shall be read and construed as if deletions therefrom were never included therein. The neuter, feminine or masculine pronoun when used herein shall each include each of the other genders and the use of the singular shall include the plural. Tenant represents that Tenant has read and understands this Lease, and has had the opportunity to seek independent legal advice with respect to the advisability of entering into this Lease. Any ambiguity in this Lease shall not be construed against the drafter, but rather the terms hereof shall be given a reasonable interpretation as if each party had in fact drafted the Lease.

42.     Time of Essence. Time is of the essence in the performance of all covenants and conditions in this Lease for which time is a factor.

43.     Independent Covenants. Each term and provision of this Lease to be performed by Landlord or Tenant shall be construed to be both an independent covenant and condition, and Landlord's or Tenant's failure to perform any term or provision on its part to be performed under this Lease shall not allow the other party to withhold or delay performance of the terms and provisions to be performed by such party under this Lease.

44.     Submission of Lease. Submission of this Lease by Landlord to Tenant for examination does not constitute an offer made, or an option granted, to Tenant to enter into this Lease. In consideration of Landlord's administrative expenses in considering this Lease, Tenant's execution and delivery of this Lease to Landlord shall constitute an offer by Tenant to lease the Demised Premises according to the terms of this Lease which offer shall be irrevocable for a period of thirty (30) days from and after receipt by Landlord of this Lease executed by Tenant or until Landlord shall deliver written notice of rejection of Tenant's offer, whichever shall first occur.

*[signature pages follow]*

FOREVER 21, INC.

IN WITNESS WHEREOF, the parties hereto have executed this Lease under seal as of the day and year first above written.

LANDLORD:

ALLIED DEVELOPMENT OF ALABAMA, LLC,
an Alabama limited liability company

By: _____
Name: _____David Mott_____
Its: _____Manager_____

TENANT:

Forever 21, Inc
a California Corporation

By: _____
Name: _____Do Won Chang_____
Its: ____Chief Executive Officer___

**FOREVER 21, INC.**

RIDER TO LEASE
BY AND BETWEEN

Allied Development of Alabama

AND

Forever 21, Inc.

1.   Construction Allowance.  Landlord agrees to reimburse to Tenant, as consideration for certain permanent alterations and improvements which Tenant will make to the Demised Premises pursuant to Tenant's approved plans and specifications such as Tenant's fixtures, furnishings and equipment including, without limitation, kitchen equipment, countertops and other "hard costs", together with "soft costs" such as architectural fees, necessary for Tenant to open the Demised Premises for business to the public (hereunder referred to as "Tenant's Work"), an amount up to Two Million One Hundred Thirty Six Thousand Six Hundred Dollars ($2,136,600.00) but not greater than One Hundred Dollars ($100.00) per square foot of the Demised Premises (such amount hereinafter referred to as "Construction Allowance").  The Construction Allowance shall be paid to Tenant, Fifty percent (50%) at delivery of Demised Premises to Tenant by Landlord along with written confirmation that the existing Tenant Store located in Mobile, AL has or will close by 10/31/18.  The balance upon Tenant's opening for business with the public, fully stocked and staffed from the Demised Premises and after Tenant provides to Landlord the following:

    (a)    a summary of all costs certified by an authorized officer of Tenant and the Tenant's general contractor;

    (b)    a copy of Tenant's certificate of occupancy (or temporary certificate of occupancy) for the Demised Premises;

    (c)    original lien waivers and releases (in such form as has been approved by Landlord), properly executed by Tenant's general contractor and all subcontractors and suppliers performing work or supplying goods in the amount of Five Thousand and No/100 Dollars ($5000.00) or more indicating that all amounts due to the general contractor, subcontractors and suppliers for such work have been paid in full;

    (d)    if requested by Landlord, copies of all invoices, work orders or other evidence of amounts claimed to be spent in completion of such portion of Tenant's Work; and

    (e)    any additional documentation reasonably requested by Landlord.

The following are conditions precedent to Tenant's full reimbursement of the Construction Allowance: (a) intentionally omitted, (b) the Demised Premises is open for business, (c) Tenant's Work has been fully completed, and (d) Tenant has submitted to Landlord's managing agent its request for payment accompanied by items (i) through (v) above.

Notwithstanding anything to the contrary contained herein, Landlord hereby reserves the right to have Landlord's or its managing agent's architect confirm Tenant's statement as to the amount of work completed within the Demised Premises prior to making any payment to Tenant.  Landlord shall not be liable for any amounts incurred by Tenant in excess of the Construction Allowance.  The Construction Allowance, or any portion thereof, may be used by Landlord to offset any past due amounts to be paid by Tenant to Landlord for which Tenant is in default under this Lease beyond applicable notice and cure periods.

In the absence of any provision of this Lease or separate written agreement between Landlord and Tenant to the contrary, Tenant acknowledges that the Construction Allowance shall not be treated by Landlord as being used for the construction or improvement of "Qualified Long-term Real Property" as defined in Internal Revenue Code Section 110.  Landlord makes no representation to Tenant as to the applicability of such Section 110 to the Construction Allowance, nor shall Landlord have any responsibility for Tenant's method of reporting the Construction Allowance or compliance with provisions of Section 110 of any other relevant law governing tax treatment of such funds.

Notwithstanding any language herein to the contrary, in the event of a default by Tenant which results in the termination of the Lease, in addition to those remedies set forth in Section 16(b), Tenant shall reimburse to Landlord that amount equal to the then unamortized portion of the Construction Allowance to be amortized over ten (10) years on a straight line basis.

FOREVER 21, INC.

**EXHIBIT A - SITE PLAN (ATTACHED)**

FOREVER 21, INC.

**Site Plan**



**EASTERN SHORE CENTRE**

NOTE: This is a site plan and is not a representation as to the size, location, or opening date of any tenant or occupancy of the building.  This site plan is subject to change and to the approval of all governmental agencies having jurisdiction.  Exact dimensions and store locations are binding only to the extent provided for in executed Leases.

FOREVER 21, INC.

TENANT'S INITIALS

LANDLORD'S INITIALS

NOTE:  This is a site plan and is not a representation as to the size, location, or opening date of any tenant or occupancy of the building.  This plan is subject to change and to the approval of all governmental agencies having jurisdiction.  Exact dimensions and store locations are binding only to the extent provided for in the executed Lease.

FOREVER 21, INC.

**EXHIBIT B - LEASING PLAN  (ATTACHED)**

FOREVER 21, INC.

**Lease Plan**



**EASTERN SHORE CENTRE**
NOTE: This is a lease plan and is not a representation as to the size, location or opening date of any tenant or occupancy of the building. This lease plan is subject to change and to the approval of all governmental agencies having jurisdiction. Exact dimensions and store locations are binding only to the extent provided for in executed leases.

FOREVER 21, INC.

_____

_____
TENANT'S INITIALS

_____
LANDLORD'S INITIALS

NOTE: This is a site plan and is not a representation as to the size, location, or opening date of any tenant or occupancy of the building. This plan is subject to change and to the approval of all governmental agencies having jurisdiction. Exact dimensions and store locations are binding only to the extent provided for in the executed Lease.

FOREVER 21, INC.

## EXHIBIT C - COMMENCEMENT AGREEMENT

WHEREAS, Allied Development of Alabama, LLC, an Alabama limited liability company, and with offices in Commack NY & Spanish Fort, AL, (hereinafter collectively called "Landlord"), and Forever 21 Inc, a California Corporation (hereinafter called "Tenant"), have entered into that certain "Lease" dated ____, 2018 for a Demised Premises known as Space number <u>818</u> in Landlord's Eastern Shore Centre, located on property situated in the  County of Baldwin, State of Alabama, and more particularly described on Exhibit A attached hereto and made a part hereof by reference; and

WHEREAS, Landlord and Tenant now desire hereby to confirm the Term Commencement Date and the Termination Date of the Lease Term and other matters as set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and of the benefits to be derived herefrom, the parties hereby agree as follows:

1.     Possession of the Demised Premises was tendered to Tenant on:

2.     Tenant opened for business in the Demised Premises on

3.     The Rent Commencement Date is:

4.     The Term Commencement Date is:

5.     The Term Expiration Date shall be:

THIS Agreement supplements and, if applicable, supersedes any dates set forth in the Lease.

EXECUTED this ____ day of _____, ____.


Allied Development of Alabama, LLC,          Forever 21 Inc,
an Alabama limited liability company          a California corporation


By: _____  _____    By: _____
       Name:                                         Name: _____
       Title:                                          Title: _____
                                                             _____


"LANDLORD"                              "TENANT"

FOREVER 21, INC.

**EXHIBIT D - INTENTIONALLY DELETED**

FOREVER 21, INC.

## EXHIBIT E - ESTOPPEL CERTIFICATE

Date:

To:

RE:     Address:
         Your Application

Gentlemen:

It is our understanding that you have committed to place a mortgage upon the subject premises and as a condition precedent thereof have required this certification by the undersigned.

The undersigned, as Tenant, under that certain Lease dated _____, ____, made with Allied Development of Alabam, LLC, an Alabama limited liability company, as Landlord, hereby ratifies said Lease and certifies that the undersigned has entered into occupancy of the premises described in said Lease on _____, ____, and the undersigned is presently open and conducting business with the public in the premises, and the minimum rental in the annual amount of _____ ($_____) was payable from the date of occupancy; that said Lease is in full force and effect and has not been assigned, modified, supplemented or amended in any way {except by agreement(s) dated _____, ____}, and that neither party thereto is in default thereunder; and, that the same represents the entire agreement between the parties as to this leasing; that the term of said Lease expires on _____, ____; that, to Tenant's actual knowledge, all conditions under said Lease to be performed by Landlord have been satisfied, including, without limitation, all co tenancy requirements thereunder, and, to Tenant's actual knowledge, all required contributions by Landlord to Tenant on account of Tenant's improvements have been received, and, to Tenant's actual knowledge, on this date there are no existing defenses or offsets which the undersigned has against the enforcement of said Lease by Landlord; that no rental has been paid in advance and no security (or in the amount of $_____) has been deposited with Landlord; and that rental for _____, ____, has been paid.

Yours very truly,

FOREVER 21, INC.

## EXHIBIT F - TENANT SIGN CRITERIA

### Eastern Shore Centre, Baldwin County, Alabama

Section 1.                                                    Purpose

The purpose of the Store Sign Criteria is to promote consistent, high quality signage, while allowing the Tenant freedom to create unique, unusual graphics, which are consistent with the overall store design. The design of all signage and graphics is subject to prior written approval by Landlord.  Conformance is strictly enforced, and non-conforming, uninteresting, or inappropriate signage will be rejected.  Note that it is the Tenant's responsibility to obtain approval by the City of Spanish Fort, Alabama and to insure compliance with local codes and ordinances.

Section 2.                                          Location and Size of Signs

The signage package consists of the following elements:

(a)                                          Main Storefront Sign:

Tenant is permitted one (1) sign per building front elevation.  Corner locations will be considered individually. The sign is limited to the trading name of the Tenant or descriptive phrase or word such as "Law Office" or "Dry Cleaners." No advertising copy, slogans or tag lines are permitted (i.e., "Shoes for the Whole Family"). Tenant may also incorporate with Landlord's approval, logos or names on both glass areas and awnings. These logos or names will not be considered as part of the signage noted above. Logos, marks or names shall conform to requirements noted in Items B & F below.

Exception:  Tenants choosing to place a graphics logo only on the sign band may do so if the logo does not exceed 68" high or 102" wide.  If this option is exercised, the Tenant may place one sign at, on or near an entrance canopy if the canopy is constructed of permanent materials and the sign described does not exceed 30" high and 120" long and meets all of the other general requirements.

(b)                                          Other Storefront Signs:
Address:

All tenants shall provide the address number of the store above or on the entrance doors or on another approved location.  The address number shall be provided by Landlord to identify the premises.  Such number design and location is at the Tenants discretion, but must be installed in accordance with postal regulations.  The Landlord encourages innovation of design and sophistication of materials (i.e. polished brass, etc.).

Canopy Graphics:

Additionally, graphics such as logos, crests, letters, etc. may be placed on the entrance canopy or window canopies.

Menu Board Signs:

Illuminated menu board signs displaying the daily menu for restaurants and food establishments with prices must be installed on the storefront or installed permanently as a free standing sign in the common area if within five (5) feet of the entrance.

Blade Sign:

Each Tenant is required to provide a minimum of one per elevation with maximum of two per Tenant. Blade signage is to provide simple straightforward Tenant identification to pedestrians.  The sign must have the Tenant's name and may include a logo or appropriate symbol emphasizing the Tenant's function or business.  No blade sign may be internally illuminated but illumination from appropriate adjacent luminaries will be considered and encouraged.

1.      Must extend perpendicular to storefront plane but no more than 4'-0" from the surface to which it is mounted nor more than 6'-0" total in front of the Tenant lease line.

2.      May not extend below 7'-0" above finished floor at the lowest point.

3.      Face area may not exceed 16 SF not including area of bracket.

4.      More than one blade sign is permissible but the total face area may not exceed 24 SF for 2 signs.

FOREVER 21, INC.

5.  The shape should be characteristic of the merchandise sold.  May not be a simple rectangle or square, unless the shape is part of a generally recognized logo or design for the store in other locations.

6.  The blade must be attached to either a bracket of the Landlord's design as specified or a bracket designed by the tenant with land lord's approval. The bracket, mounting and installation are by tenant with Landlord's approval.

7.  The thickness of the blade sign shall be a minimum of 1-1 /2" around the entire perimeter in the case of a metal sign this can be in the form of an appropriately proportional frame.

8.  The blade sign may be fabricated from metal (no bare metal), wood or exterior grade foam with a weather-resistant coating(s).

9.  Molded, vacuum formed fiberglass or plastic blade signs are not permitted.

Each Tenant may provide at his option one (1) sign with a maximum overall area of 15" x 20" indicating the hours of operation.  This sign shall be located within 5'-0" horizontally of the Tenant entrance.  Letters on glass shall consist of a maximum size of 1" white or gold reverse adhesive die-cut vinyl letters - Helvetica Medium or similar.  Size of letters and type style may vary or be executed in a different manner if unusual and distinctive with the approval of the Landlord.  Open/closed signage may not be neon or include credit card information or advertising.  Advertising decals may not be applied to the storefront.

Service Entrance Door Sign:

Tenant shall provide Tenant trade name and address identification signage at rear service entrance.  Copy shall be 3" high, pre-spaced, die-cut vinyl letters, self-adhesive matte white, 3.5 mil thickness equal to Scotchcal installed on Tenant rear door.

Other Graphics:

Each Tenant may submit proposals for additional signage but approval of such will be granted only when appropriate for the storefront design requirements and if the proposal not only adheres to the requirements but also enhances, in the opinion of the Landlord or the project architect, the design intent.  The proposed graphics may be:

1)  Signage on glass, i.e. "Established 1873" or "Cheese mongers since 1931", etc. Such signage may be:

- alphanumeric or graphic symbols no more than 6" high with serif or ornate type face, or
- larger recognized graphics logos, all permanently painted or silk screened on interior side of glass (gold leaf, metallic color, etc.)

2)  Graphics constructed of neon, non-flashing, mounted near the storefront glass area in a manner that enhances the design intent.

3)  Edge-lit sandblasted glass.

Section 3.                                   Sign Specifications

All Tenant main storefront signs shall be illuminated.  No illuminated box signs of any type will be allowed.

(a)                                      Types Suggested

1)  Individual dimensional metal back-lit (halo effect) reverse channel letters or lighted by decorative external light fixtures.

2)  Internally Illuminated channel letters with opaque metal sides and translucent plastic faces. Transformer may be placed behind the sign fascia with provision made for proper cooling and access.

3)  Exposed neon tubes in open channels forming letters or logos; however, neon is to be used in a decorative as well as informative fashion and shall be allowed only at the discretion of the Landlord on an individual basis.

FOREVER 21, INC.

(b)          Size allowed for main storefront sign:

1)      Maximum height of single line of copy is 36 inches for the internally illuminated sign

Exception:  A letter of unusual shape or ampersand may extend beyond the maximum height requirements if approved by Landlord.

2)      Maximum total height of sign for two or more lines of copy: 54"

3)      Maximum length of sign: 75% of length of leased storefront or thirty-six feet, whichever is less.

4)      Maximum Area of Sign: 1-1/2 square feet/linear foot of leased storefront, the area shall be calculated as a box enclosing all letters, numbers and symbols of sign design, including all spaces separating letters, numbers and symbols.

Section 4.                    Sign Criteria Requirements

All Tenants are required to purchase their own signs and pay all cost for installation and any electrical service connections to the Tenant's electrical service as required.

The Landlord reserves the right to review and approve or disapprove all proposed plans, installation and graphic treatment governed by these Criteria per the Landlord's interpretation, and to require revisions of any sign design or installation which the Landlord judges not in compliance.

Tenant shall be responsible for removal of Tenant's signs upon termination of the Lease including the cost of removal.  Fascia and other building elements shall be returned to the original condition and all penetrations appurtenant to the Tenant's sign installation shall be repaired by the Tenant to the satisfaction of the Landlord.

Tenant shall not erect, install, paint or fix any signs, posters, cards, banners or other advertising medium to, upon or above the exterior of the premises of the building, nor on the interior or exterior of the premises of the building, nor on the interior or exterior of the glass surface of the windows and doors, except as stated herein.  Tenant shall bear all costs for correction of sign installation and damage to the building by signs that do not conform to this Sign Criteria.  The Landlord reserves the right to have all non-conforming signs removed regardless of state of erection.

The Landlord reserves the right to make periodic changes to these Criteria which in the sole discretion of the Landlord will benefit of the Center.

Sign fabrication and installation shall comply with local sign ordinances and any applicable building codes and the National Electrical Code.  All internal and external wiring, lighting, and other electrical devices shall bear the UL® symbol. It is the Tenant's responsibility to verify that the sign installation is in accordance with these requirements.

Tenant is responsible for maintaining the sign in a good state of repair including prompt replacement of burned out lighting or damaged pieces.  Tenant has 24 hours to make repairs after notification in writing by Landlord.

All signs shall be mounted according to Landlord approved drawings.  All fasteners shall be of non-corrosive material and concealed.   Fabrication and installation shall be by Landlord approved sign contractors only or Tenant's national sign contractor.

Sign company names or stamps shall be concealed if permitted by Code.

No animated components, flashing lights, formed plastic, injection molded box type or solid panel signs are permitted.

Section 5.                    Submittals

Each Tenant shall supply three (3) copies of scaled drawings to the Landlord for review and approval. The drawings must show the sign in relation to the entire façade of the store and include details of the color, size and construction of the sign

The Tenant's sign drawings and submittal must include the following:

- Elevation view of storefront showing sign (drawn to accurate scale) with dimensions of height of letters and length of sign.
- Color sample of sign.

FOREVER 21, INC.

- Color sample of sign letters (unless they are to be white).
- Cross section view through sign letter and sign panel showing location of sign relative to the storefront line and showing the dimensioned projection of the face of the letter from the face of the sign panel.
- The drawings shall also show other elements such as soffits, canopies and the relationship of the sign to the other elements of the storefront, especially the vertical fascia.

Landlord must approve sign drawings in writing prior to the fabrication or installation of any signage. All permits for signage and installation of signage shall be at Tenant's sole cost and expense. Sign installation must be coordinated with the project Tenant Coordinator or Manager prior to the start of any work. Landlord shall not be responsible for the cost of signs fabricated or installed that do not conform to the sign criteria or do not receive written approval from the Landlord.

Section 6.                              Miscellaneous Sign Requirements

All storefront signage must be illuminated. All signs must be connected to Tenant's electric service. All electrical penetrations through the storefront fascia for sign installation shall include PK housings. All electrical signage is to bear the UL® label and must comply with all governing codes. All conduit, raceways, crossovers, wiring, ballast boxes, transformers, and other equipment necessary for sign connection shall be concealed.

Tenant will not be allowed to open without Landlord-approved permanent signage installed. Vinyl banners are not allowed at any time. Please allow adequate time to design, fabricate and install signage, prior to opening of store.

Sign design is encouraged to be different from adjacent and nearby stores, i.e., type, color, size, format.

Any sign, notice, or graphic, located within the interior of the Demised Premises and easily legible from the common area of the Shopping Center, requires the prior written approval of Landlord.

Light leaks in sign letters will not be allowed and must be repaired promptly by Tenant.

The following types of signs and sign components are strictly prohibited:

- Box or cabinet-type construction in which the background as well as the letters are illuminated.
- Non-illuminated main signage.
- Signs employing audible equipment, or moving or flashing lights.
- Signs employing exposed raceways, ballast boxes, or transformers.
- Sign manufacturers' names, stamps, or decals.
- Signs employing luminous vacuum formed-type plastic letters.
- Signs employing a raw edge or uncapped plastic letters with no returns and exposed fasteners.
- Paper or cardboard signs, sticks, or decals hung around, on, or behind storefront.
- Roof top signs
- Banners or flags without prior written approval

All letters are to be of full-welded construction. Channeled letters, bolts, fastenings, and clips shall be of enameling iron with porcelain enamel finish; stainless steel, polished brass or copper, or carbon baring steel with painted finish. No black iron material will be allowed.

Sign contractor shall repair any damage caused by its work.

FOREVER 21, INC.

**EXHIBIT G – INTENTIONALLY OMITTED**

FOREVER 21, INC.

## EXHIBIT H - "VANILLA BOX"

Eastern Shore Centre

<u>Landlord to Provide</u>
Premises to be delivered in "AS-IS" condition, with the exception of (i) Landlord demoing any existing improvements in the Premises and demising the spaces into a single unit and ensuring that all utilities required by Tenant are brought into the Premises in locations specified by Tenant; (ii) subject to any latent defects discovered by Tenant within one year after Landlord's delivery of the Premises to Tenant, (iii) Landlord's responsibility for any pre-existing Hazardous Substances, and (iv) the Premises shall be in compliance with all applicable laws.

<u>Tenant to Provide</u>
Tenant shall construct the space to the Tenant's most current, modern prototype.  Subject to the delivery obligations above, Tenant will be required to perform and complete all above and beyond the "As-Is" condition of the Premises in accordance with all the federal, state, and local laws, rules, ordinances, regulations, and code requirements for the Premises and Landlord's Design Criteria.  Landlord reserves the right to approve the plans and specifications for Tenant's Work.

FOREVER 21, INC.

## EXHIBIT I – EXISTING KIOSKS

**Lease Plan**



### EASTERN SHORE CENTRE
NOTE: This is a lease plan and is not a representation as to the size, location or opening date of any tenant or occupancy of the building.  This lease plan is subject to change and to the approval of all governmental agencies having jurisdiction.  Exact dimensions and store locations are binding only to the extent provided for in executed leases.

FOREVER 21, INC.